UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEAGRAPE INVESTORS LLC,<br><br>          Plaintiff,<br><br>     -against-<br><br>KALEIL ISAZA TUZMAN, KIT CAPITAL LTD., KIT CAPITAL (NEVIS) LLC, OBRA PIA LTD., OBRA PIA (U.S.) FEEDER, LP, OBRA PIA MANAGEMENT, GP, LTD., OBRA PIA LTD., SURCUSAL COLOMBIA, AMANDA BLAUROCK, ROSARIO DAVI, JOSEPH P. GARLAND and KENNETH A. ELAN,<br><br>          Defendants. | Civil Action No. _____ |

## **COMPLAINT**

Plaintiff, Seagrape Investors LLC, ("Plaintiff") by and through its counsel, Press Koral LLP, for its Complaint against Defendants Kaleil Isaza Tuzman, KIT Capital Ltd., KIT Capital (Nevis) LLC, Obra Pia Ltd., Obra Pia (U.S.) Feeder, LP, Obra Pia Management, GP, Ltd., Obra Pia Ltd., Surcusal Colombia, Amanda Blaurock, Rosario Davi, Joseph P. Garland and Kenneth A. Elan (collectively "Defendants"), states as follows:

## **INTRODUCTION**

1.      This action arises from fraud by Defendants Kaleil Isaza Tuzman, Rosario Davi, Amanda Blaurock, and a number of offshore entities under their ownership and control (the "OP Defendants"), in connection with the solicitation of millions of dollars in loans and investments from Plaintiff, Seagrape Investors, LLC, to fund the development of a luxury hotel project in Cartegena, Colombia, known as the Convento Obra Pia Hotel & Resort (the "Project"), as well as

numerous breaches of fiduciary duties by the OP Defendants in the management of the troubled Project.

2.      After Tuzman was charged in the Southern District of New York with federal securities and accounting fraud in connection with another of his businesses—for which he ultimately was convicted—Seagrape's principal, Edward Mullen, discovered that Tuzman fraudulently induced him into making the loans and investments upon materially false representations of fact concerning the Project, including vast overstatements of the amount that Tuzman and his entities had personally invested in the Project. Mullen further discovered that, with the acquiescence of Defendants Rosario Davi and Amanda Blaurock—respectively, KIT Capital's Chief Financial Officer and General Counsel—Tuzman applied over $379,000 dollars in invested capital to personal luxury items, such as cars, clothing and watches, that could have no proper purpose in a real estate development.

3.      For several years, Seagrape allowed Tuzman an opportunity to sell or complete the Project, and to pay back his investors, including Seagrape. In 2016, one potential bidder, GACP Latin America Partners LLC ("GACP"), entered into a non-binding letter of intent to purchase the Project. To facilitate a potential purchase by GACP, Seagrape entered into a Credit Security Agreement ("CSA") with certain OP Defendants under which, among other things, (1) Seagrape agreed to forbear from "foreclosing" against the assets of the Project—on Seagrape's mature claim to a "Cash Amount Due" of $4,694,806—until a "Foreclosure Date" of March 31, 2017; and (2) OP Defendants committed that they would "fully cooperate to facilitate Seagrape's foreclosing on the property and shall not block such foreclosure or cooperate with anyone seeking to block it." Seagrape also entered into a Subordination Agreement directly with GACP, to enable GACP to lend funds for a partial payment to Seagrape among other things, Seagrape promised GACP that

Seagrape would "provide [GACP] at least three (3) months advance notice" before "declar[ing] a default with respect to any Subordinated Loan or exercise[ing] any rights with respect to the collateral securing the Subordinated Loans."

4.      To conceal the OP Defendants' previous inflated valuation of the Project, and in the hope of achieving a return on his equity at the expense of his creditors, Tuzman held out for terms unacceptable to GACP, and the March 31, 2017 Foreclosure Date passed. On April 27, 2017, pursuant to the terms of the Subordination Agreement, Seagrape gave GACP written notice of Seagrape's intent to declare a default and to enforce all of its rights, including against the assets of the Project.

5.      Over six months later, on November 9, 2017, Seagrape duly filed a complaint with the Colombian Superintendencia de Sociedades ("SDS"), requesting that it investigate irregularities at OP BVI's Colombian subsidiary. As reflected in a written Resolution of the SDS, the SDS concurred with Seagrape that OP BVI's subsidiary was in "critical" financial and administrative condition. The SDS thus placed the subsidiary under its supervision and required Defendant Obra Pia, Ltd., Surcusal Colombia (the "Branch") to implement substantial reforms.

6.      On January 21, 2019, Seagrape served Defendant Obra Pia, Ltd. ("OP BVI"), an entity organized under the laws of the British Virgin Islands ("BVI"), with a Statutory Demand under the BVI's Insolvency Act, 2003 for repayment of Seagrape's loans, then totaling over $5 million. In opposition, based upon a factually false and misleading legal opinion by Defendant Joseph P. Garland, OP BVI contended that it had off-setting counterclaims against Seagrape arising under New York law. Uncertain of the merits of claims under New York law, the BVI court abstained from attempting to adjudicate them, and conditionally set aside the Statutory Demand— but only if OP BVI commenced action on its claims in New York within thirty days. If OP BVI

failed to do so, or failed to diligently pursue its alleged claims in New York, the court ordered that OP BVI's debt to Seagrape would be "payable immediately."

7.      Rather than pay their obligations to Seagrape—which Tuzman, Davi, Blaurock and other agents of the OP Defendants previously conceded on countless occasions—the OP Defendants elected to commence a frivolous lawsuit in New York, solely for purposes of delay. In the lawsuit, filed by Defendants Garland and Kenneth A. Elan, in an attempt to defraud the court, the OP Defendants asserted the same factually false claims with which Defendants hornswoggled the BVI court—upon which the OP Defendants claimed they were entitled to an award of $20 million dollars. Defendants also frivolously named Plaintiff's principal, Edward V. Mullen, as a defendant, solely to drag him through the mud and damage his good business reputation. However, upon receipt of a Rule 11 safe harbor warning letter, Defendants Garland and Elan elected to withdraw as counsel, and the fraudulent complaint was withdrawn and replaced.

8.      As a result of their collective efforts, for many years, the OP Defendants successfully thwarted Plaintiff's clear right to a recovery under the parties' contracts. Plaintiff now brings this action to right Defendants' wrongs, reduce to judgment Plaintiff's undisputed right to payment and to vindicate its right to other and further damages, collectively totaling over $10 million dollars.

## THE PARTIES

9.      Plaintiff Seagrape is a limited liability company organized under the laws of the State of Florida, with its place of business located at One South Ocean Blvd, Suite 306 Boca Raton, FL 33432.

10.     Defendant Kaleil Isaza Tuzman is a citizen of the State of New York.

11.     Defendant KIT Capital, Ltd. ("KIT Capital Dubai"), is a corporation organized under the laws of Dubai. KIT Capital Dubai is 100% owned by Tuzman.

12.     Defendant KIT Capital (Nevis) LLC. ("KIT Capital"), is a limited liability company organized under the laws of the Island of Nevis. KIT Capital is 100% owned by Tuzman.

13.     Defendant Obra Pia, Ltd. ("OP BVI"), is a corporation organized under the laws of the British Virgin Islands, with its principal place of business at Jayla Place, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands. OP BVI is 100% owned by KIT Capital.

14.     Defendant Obra Pia (U.S.) Feeder, LP ("OP Feeder"), a limited partnership organized under the laws of the British Virgin Islands.

15.     Defendant Obra Pia Management GP, Ltd. ("OP Manager"), is a corporation organized under the laws of the British Virgin Islands and is the General Partner of OP Feeder. OP Manager is 100% owned by KIT Capital.

16.     Defendant Obra Pia, Ltd., Surcusal Colombia (the "Branch") is a corporation organized under the laws of Colombia. The Branch is 100% owned by OP BVI.

17.     Defendant Amanda Blaurock is a citizen of Colorado.

18.     Defendant Rosario Davi is a citizen of New York.

19.     Defendant Joseph P. Garland is a citizen of the State of New York.

20.     Defendant Kenneth A. Elan is a citizen of the State of New York.

## JURISDICTION AND VENUE

21.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 to the extent that Plaintiff's claims are founded upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder. The Court also has federal diversity jurisdiction under 28 U.S.C. § 1332(a)(2) to the extent that (1) Plaintiff and its beneficial owners

are based exclusively in the State of Florida and Defendants are citizens either of another state or of a foreign country; and (2) the amount in controversy exceeds $75,000.

22.     This Court has personal jurisdiction over Defendants pursuant to the terms of the one or more forum selection clauses under which Defendants specifically consented to personal jurisdiction in New York under New York General Obligations Law § 5-1401(1). The Court further has personal jurisdiction under CPLR § 302, among other things, because Defendants transacted business within the State of New York and entered into numerous contracts related to this matter therein and committed tortious conduct individually or through their agents in the State of New York.

23.     Venue is proper in this district under 28 U.S. Code § 1391(b)(1) & (3).

## FACTUAL BACKGROUND

24.     In the 1990's, Seagrape's, Edward V. Mullen, attended Harvard University with Tuzman, commencing a long history of friendship and business dealings.

25.     After graduation, Tuzman worked for five years at Goldman Sachs, before launching govWorks, Inc., an Internet startup, the rise and fall of which was chronicled in the 2001 documentary film Startup.com.

26.     Between 2001 and 2010, through his vehicle KIT Capital, Inc. ("KIT Capital"), Tuzman bought and sold one or more startup technology and media-related companies. Tuzman also established KIT Digital, Inc. ("KIT Digital"), an internet-video technology company, which was listed on the NASDAQ exchange under the ticker symbol KITD.

**A.  The Investment Agreement**

27.     Prior to 2013, Mullen agreed to lend and invest various sums of money to Tuzman to fund one or more of his transactions.

28.     On May 1, 2013, the parties entered into an Investment Agreement (the "Investment Agreement") between Mullen and Oaktree Partners LLLP, as lenders, KIT Media, Ltd. ("KIT Media"), as "Recipient," and Tuzman as "Guarantor." The Investment Agreement stated that (a) through April 1, 2012, the Investors previously had invested the sum of $1,885,513 (the "Prior Amount"); and (b) and that the Investors agreed to lend KIT Media an additional $1,850,000 (the "New Amount") pursuant to the terms of the Agreement.

29.     Under § 3.1 of the Investment Agreement, in connection with the Prior Amount, the parties agreed that KIT Media would pay the sum of $2,161,492, including a "guaranteed return" of $275,979, on or before a "Due Date" of December 31, 2013. Upon such payment, the Investors would transfer their previously owned shares in KIT Media to KIT Capital. In addition, the parties agreed that, on or before the Due Date, KIT Media would pay the Investors the New Amount, along with a 20% share of KIT Media's profits during the period of the loan.

30.     As security for both the Prior and New Amounts, under § 5.1 of the Investment Agreement, Tuzman agreed to pledge a first mortgage and security interest in two properties (the "Collateral"): (a) Palais Mire Juan, 155 Avenue de Marechal Juin, Cannes, France; and (b) 1418 Eagle Way, Park City, Utah. Tuzman represented to Mullen that these two properties provided ample security for the amounts due under the Investment Agreement.

31.     Under § 5.6 of the Investment Agreement, Tuzman agreed, as Guarantor, to personally guarantee each of the obligations of KIT Media and its holding company, including payment of the Prior and New Amounts, "with full personal recourse to the Guarantor." The parties agreed that the "guarantee shall survive the death, disability, insolvency, bankruptcy and transfer

for the benefit of creditors or otherwise of Guarantor and be binding upon and become the obligation of Guarantor's heirs, executors, personal representatives, trustees, successors and assigns." The terms of this guarantee were incorporated and carried forward into the parties' subsequent agreements.

32.     Section 7.2 of the Investment Agreement provides that there shall be an event of Default, among other things, if (a) the Recipient fails to make any of its payment obligations under the Agreement by the Due Date; or (b) the Guarantor fails to perform any of his obligations under the Agreement, including failing to perfect a first mortgage on the Collateral.

33.     Section 11 of the Investment Agreement provides that the agreement "shall be governed by and construed in all respects in accordance with the laws of the State of New York and the Parties submit to the non-exclusive jurisdiction of the New York Courts."

34.     Finally, § 12 of Investment Agreement includes attorneys' fees and costs provision, which provides that "[i]f, and as often as, this Agreement is referred to any attorney by necessity in order to collect any sum payable hereunder or to defend or enforce any of Investor's rights hereunder, or to commence an action or claim by Investor against Recipient, Guarantor or the Holding Company relating to this Investment Agreement, Recipient and/or Guarantor shall reimburse Investor for all costs incurred in connection therewith including attorney's fees (including such fees incurred in appellate, bankruptcy or insolvency proceedings), with or without the institution of any action or proceeding, and in addition to all costs, disbursements and allowances provided by law."

**B.  The OP Defendants Induce Seagrape to Enter into the Addendum to Investment Agreement and to Purchase $1 Million in Limited Partnership Units of OP Feeder**

35.     In 2013, KIT Media defaulted upon its payment obligations under the Investment Agreement. Tuzman likewise defaulted on his obligation to execute documents perfecting the Investors' security interest in the Collateral. Nevertheless, Tuzman assured Mullen that business was going well and that he would soon be paid. Due to their close personal friendship, without waiving any rights, Mullen allowed Tuzman additional time to satisfy the obligations of himself and his entities under the Investment Agreement.

36.     In or about 2014, Tuzman advised Mullen that he owned a luxury resort development project, known as the Convento Obra Pia Hotel & Resort (the "Project"), located in Cartegena, Colombia. Tuzman stated that he held the Project through his ownership and control of KIT Capital and OP BVI, the Colombian subsidiary of which—Obra Pia Ltd., Surcusal Colombia—held title to five parcels of real estate, as well as all relevant construction licenses and entitlements, related to the Project.

37.     Tuzman stated that he had a contract with Viceroy Hotel Group ("VHG") to serve as the manager of a 102-key Viceroy-branded hotel, which would "include[] a 275 m2+ courtyard pool, 850 m2+ fitness center and spa, signature restaurant and nightclub, panoramic rooftop pool and bar with 360-degree views of Cartagena and its environs, and over 3,000 m2 of indoor and outdoor event space."

38.     In an email dated April 7, 2014, Tuzman stated to Mullen that KIT Capital (a) "got the $20M bank loan in place and began work about a month ago (expected construction completion date Dec '15); and (b) had received a $5 million equity investment from Mubadala, an investment fund based in Abu Dhabi ("Mubadala equity: US$5MM"). In fact, the $20 million bank loan was not "in place" and Mubadala had not invested in the Project.

39.    In an email dated July 3, 2014, Tuzman again stated to Mullen that (a) he personally had invested $10 million dollars in the Project; (b) he had obtained a $20 million dollar bank loan to develop the property; and (c) the existing property had been "appraised by the bank," in its current state, at $27.5 million dollars. These representations were materially false and misleading. In view of how allegedly profitable the Project was, Tuzman bragged "I ought to stop doing tech stuff altogether and focus on real estate only. :-) Seriously, bro, this wouldn't have possible without you! I am in debt to you beyond the money. Thank you for being such a good friend over the years." Tuzman omitted to disclose that, upon information and belief, Tuzman had misapplied substantial sums provided by Mullen under the Investment Agreement to Tuzman's own personal expenses.

40.    Tuzman stated that he was forming a Real Estate Investment Trust ("REIT" or "Fideicomiso") in Colombia to hold the Project, and then was in the process of filing registration documents with the Colombian securities authorities.

41.    In the last two weeks of August 2014, Mullen joined Tuzman and some of his friends on a luxury yacht trip in Turkey. During the trip, Tuzman asked Mullen to invest in a $6 million dollar friends and family round of funding for the Project (the "Hybrid Round").

42.    After returning from the trip, on September 14, 2014, Tuzman provided Mullen with a draft term sheet and draft disclosure documents in connection with the Hybrid Round, which did not correct his prior materially false and misleading statements. The Hybrid Round was structured as a purchase of limited partnership units (the "LP Units") in Defendant Obra Pia (U.S.) Feeder, LP ("OP Feeder"), a limited partnership organized under the laws of the British Virgin Islands, which held a 12.5% promissory note issued by OP BVI, convertible into shares of OP BVI. On September 16, 2014, Tuzman provided Mullen with a draft Subscription Agreement for

the LP Units of OP Feeder, which likewise did not correct his prior materially false and misleading statements.

43. On September 17, 2014, Tuzman emailed Mullen with news concerning a setback on the Project. He stated that "the Columbian Superintencency of Banks has confirmed that they will NOT allow for submission of our REIT prospectus until (a) all 2014 property taxes are paid, (b) 2014 corporate franchise taxes are paid, and (c) construction permit is paid." Tuzman said he was attempting to raise those funds, to eliminate the issue.

44. On the following day, September 18, 2014, Tuzan proposed that Mullen lend the funds needed to pay the taxes and permit expenses. Tuzman presented Mullen with a proposed amendment to the parties' Investment Agreement, under which Mullen would extend a further loan of $343,646 to pay the taxes and expenses. Tuzman implored Mullen to enter into the amendment, which he said would be a "MASSIVE help" in connection with the REIT application. Tuzman also proposed to substitute the Project as the Collateral under the amended agreement.

45. In reliance upon Tuzman's prior representations and omissions concerning the Project, on September 19, 2014, Mullen agreed in principal to the terms of a proposed draft Addendum to Investment Agreement (the "Addendum"). However, after reaching an agreement in principle, the parties continued to negotiate the terms of the Addendum, until a final executed version was reached on November 27, 2014.

46. Under the draft Addendum, Seagrape agreed to apply a portion of the existing debt to the purchase of $1,000,000 in LP Units in OP Feeder. On September 24, 2014, before the parties finalized and executed the Addendum, Tuzman provided Mullen with a revised draft version of the Hybrid Round Term Sheet and Subscription Agreement, which did not correct Tuzman's prior affirmative misrepresentations and omissions concerning the Project.

47.     On September 28, 2014, Tuzman provided Mullen with an email investor letter and access to a complete library of documents related to the Hybrid Round offering (the "Hybrid Round Documents"), including the following: (a) Viceroy Cartegena Overview Presentation; (b) Viceroy Cartegena Jones Lang Lasalle Feasibility Study; (c) Viceroy Cartegena Land Appraisal; (d) Viceroy Cartegena Architectural Plans; and (e) OB BVI Investment Documents. The OP BVI Investment Documents included a (i) Hybrid Round Term Sheet; (ii) Subscription Agreement for OP Feeder LP Units, with instructions; and (iii) an investment flow chart, showing the anticipated transactions, including the transfer of the Project to a Colombian REIT ownership structure. These materials did not correct Tuzman's prior affirmative misrepresentations and omissions concerning the Project.

48.     On November 12, 2014, Tuzman sent Mullen the latest version of the teaser, term sheet, LP agreement and investment flow chart—which did not correct Tuzman's prior affirmative misrepresentations and omissions concerning the Project.

49.     Seagrape subsequently learned that Tuzman paid, not over $10 million, but no more than USD $5.5 million to purchase all five parcels of real estate comprising the Project, as follows: (a) *Casa Bruno*: $1,900,000,000 pesos (USD $561,859); (b) *Casa Nery*: $2,600,000,000 pesos (USD $768,859); (c) Contraloria: $2,100,000,000 pesos (USD $621,002); (d) *Media Luna*: USD $485,000; and (e) *Obra Pia*: 10,350,000,000 pesos (USD $3,060,650). Plaintiff also later learned that no construction at all took place on the Project until at least November 2014, thus there could not have been any substantial additional costs and expenses. Plaintiff also later learned that Mubadala had not invested $5 million in equity in the Project.

50.     KIT Capital thus had far less financially at risk in the Project than Tuzman claimed. Rather than being asked to provide a fraction of the capital invested in the Project by Tuzman,

Plaintiff was being asked to make an outsized loan and investment of essentially the same amount as KIT Capital/Tuzman.

51.     In reliance upon Tuzman's false and misleading representations concerning the Project, on November 27, 2014, on behalf of Seagrape, Mullen executed the final version of the Addendum, as well as the Hybrid Round Subscription Agreement, and Seagrape acquired 100 LP Units in OP Feeder as an "ongoing investment," as well as 400 LP Units as security under the Addendum. Prior to doing so, on November 27, 2014, Tuzman represented that "the Investment Addendum supersedes the LP Subscription documents, irrespective of any section which might imply otherwise."

### C.  The Addendum to the Investment Agreement

52.     In the Addendum, Seagrape replaced Mullen and Oaktree as the "Investor," Defendant OP Feeder replaced KIT Media as the "Recipient." In addition to Tuzman, KIT Capital Ltd. and OP BVI each agreed to serve as a Guarantor, pursuant to the terms of the Investment Agreement. The Addendum specifically incorporated and adopted the terms of the Investment Agreement, except where "specifically changed or overwritten by [the] Addendum." Thus, the Addendum incorporated the guarantor and attorneys' fees provisions of the Investment Agreement.

53.     In the Addendum, OP Feeder and the Guarantors acknowledge that the amounts due under the Investment Agreement for both the Prior and New Amounts were not paid. *See* Addendum at 3. Accordingly, the parties agreed that, net of a $50,000 redemption, the total amount due under the Investment Agreement (the "2013 Amount Due") was $4,331,492. The parties further agreed that Seagrape was entitled to a 10% return (the "Delay Preferred Return") upon the 2013 Amount Due, resulting in a new amount due of $4,656,354 (the "New Amount Due"). The due date for payment of the New Amount Due was March 31, 2015. *See* Addendum § 1.4.

54.     As noted above, the parties agreed that Seagrape would lend the additional sum of $343,646 (the "Additional Investment"), which would be used to pay the outstanding taxes and operational expenses of the Project. *See* Addendum § 2.1. Commencing on October 1, 2014, like the New Amount Due, the Additional Investment would accrue interest at the Delay Preferred Return rate of 10%. *See id.* § 2.2.

55.     Including both the New Amount Due and the Additional Investment, the parties agreed that the total amount due to Seagrape was $5,000,000, plus the Delay Preferred Return. *See id.* § 2.5.

56.     In exchange for a reduction of the balance to $4,000,000 (the "Current Amount Due"), OP Feeder agreed to issue to Seagrape 500 limited partnership interests in OP Feeder, 100 of which constituted "Ongoing Investment Interests," and 400 of which would be returned upon redemption by OP Feeder of the Current Amount Due. Consistent with the Addendum, on November 28, 2014, in reliance upon Tuzman's good faith, Seagrape executed the Limited Partnership Agreement of OP Feeder.

57.     As security for payment of the Current Amount Due, plus the Delay Preferred Return, the Guarantors pledged as "New Collateral" their interests in the Project, which they represented was appraised at $28,200,000 by an appraisal firm appointed by a major Latin American banking institution, a valuation which OP Feeder and the Guarantors represented and warranted as "a fair and reasonably accurate determination of the current Fair Market Value of such properties." *Id.* § 3.2.

**D. Blaurock Receives an Interest in Hybrid Round LP Units as a Purported Commission**

58.     Although Blaurock did not procure Mullen or Seagrape as an investor, in connection with the Hybrid Round offering,  New Col Holdings, LLC ("New Col"), an entity in

which Blaurock holds an interest, received LP Units as an alleged commission in connection with Blaurock's alleged role in raising capital pursuant to the fraudulent Hybrid Round Documents.

59.     Upon information and belief, Blaurock received through New Col over $200,000 in LP Units of OP Feeder.

**E.  The OP Defendants Hire DTZ/Colliers to Raise Further Financing**

60.     Even after the Hybrid Round, the OP Defendants required substantial bank financing to complete construction of the Project. Contrary to Tuzman's representations to Mullen in 2014, a $20 million bank loan had not been secured for the Project. Accordingly, in or about 2015, Tuzman retained Jeff Donnelly, of Cassidy Turley Commercial Real Estate Services, Inc. d/b/a DTZ ("DTZ"), in New York, to raise potential bank or other financing.

61.     In or about June 2015, Tuzman and Blaurock provided Seagrape—and, upon information and belief, other investors and potential investors—with an offering memorandum prepared by DTZ on behalf of KIT Capital (the "DTZ Memorandum"), seeking financing for the Project in the amount of $23,561,213. The DTZ team assigned to the matter, including Donnelly, Ulrike Ahrens and Robert Dicker, subsequently moved to Colliers International NY LLC ("Colliers"), which continued the representation.

62.     Among other things, the DTZ Memorandum—based upon representations by Tuzman, Davi and Blaurock—stated that KIT Capital "began construction of the project on in November 2014 and has already invested $27.8 million in equity to date," including $22.5 million in "pre-development" land acquisition costs, $2,971,000 in construction costs and $2,522,000 in indirect development costs.

63.     As Seagrape would later learn, these representations were false. Tuzman's manipulation and misrepresentation of these facts was not innocent or isolated, but part of a broad and pervasive pattern of conduct by Tuzman across multiple businesses, including KIT Digital.

**F.  Tuzman's Indictment Threatens Seagrape's Loans and Investments**

64.     In September 2015, Tuzman was indicted by federal prosecutors in the Southern District of New York on eight counts of securities and wire fraud arising from market manipulation and accounting fraud at Tuzman's separate, publicly traded company, KIT Digital, occurring between 2008 and 2012, and arrested in Colombia.

65.     The charges against Tuzman included (a) a scheme, with a conspiring hedge fund, to artificially inflate the share price and trading volume of KIT Digital stock at crucial times, such as at the time of its listing on NASDAQ; (b) the placement of $1,150,000 of company funds with the conspiring hedge fund, which was represented to KIT Digital shareholders as a legitimate investment, but in fact was used to engage in transactions manipulating the price of KIT Digital stock; (c) a scheme to falsely inflate the revenue of KIT Digital through the premature recognition of revenue for the sale of software products that had not been delivered to customers; and (d) a scheme to falsely inflate the revenue of KIT Digital through fraudulent round trip transactions, in which the company secretly used its own cash to pay accounts receivable, rather than recognizing losses from unpaid bills customers that were uncollectible.

66.     On September 7, 2015, without disclosing that he had been indicted, Tuzman emailed Mullen requesting that he loan him $400,000, as a "backstop" to cover payroll and other expenses—to protect the Project. Mullen dutifully wired the money to KIT Capital's CFO, Davi. A few weeks later, at Tuzman's request, Mullen loaned KIT Capital an additional $41,000.

67.     Tuzman was extradited from Colombia to the United States and, on December 26, 2017, ultimately found guilty on all charges of conspiracy to commit securities fraud and conspiracy to commit wire fraud.

### G. Tuzman Promises to Sell the Project

68.     The indictment of Tuzman, on grounds of financial fraud impacted the viability of the Project, and placed Seagrape's loans and investments at risk. As a result of his difficulties, Tuzman agreed to seek out a third-party that would purchase the Project in its unfinished state, so that Seagrape and other investors could receive a return on their troubled investments. Mullen agreed to help identify such a suitable purchaser or investor.

69.     On November 19, 2015, Blaurock—now acting President of KIT Capital—circulated to Mullen an "outreach" email she had presented to potential purchasers, which represented that "US$19 million in cash has been spent since 2010, roughly broken down as follows: (i) All five property purchases (including transfer duties, notary fees and broker commissions): Approx. US$11.3 million; (ii) Pre‑licensing costs (architectural design, taxes, legal, some structural work, 2010‑2014): Approx. US$1.6 million; (iii) Phase 1 construction and soft costs, all‑in (Nov 2014 to present): Approx. US$6.3 million."

70.     In an email on December 16, 2015, Davi repeated to investors—including Mullen—the assertion that KIT Capital had spent $19 million in "hard cash" on the Project since 2010. Similarly, in an email to Donnelly, copying Mullen, dated December 21, 2015, Tuzman reiterated his claim that $19 million in "hard cash" had been spent on the Project.

71.     As a result of the offering process, Tuzman, Davi and Blaurock claimed KIT Capital began to receive offers to purchase the Project, including a non-binding offer valuing the Project at $27 million—an amount sufficient to result in a full return to Seagrape, the senior secured creditor.

72.     In a letter dated December 29, 2015, on behalf of KIT Capital, its counsel David Pedley confirmed to Mullen that "based upon the records I have reviewed, Seagrape is owed in

excess of $7 million and the Loan Agreement provides that interest is continuing to accrue on amounts owed to Seagrape." Pedley confirmed that "[t]he Obra Parties are currently engaged in a sales process/capital raise and I understand that, pursuant to this process, Seagrape will be paid off in whole or in part at the closing of the transaction (depending upon the amount of cash coming in at the closing)."

73.     On January 15, 2016, in connection with discussing the retention of Colliers to identify an investor, Mullen informed Blaurock, Davi, Pedley and Donnelly that "Obra Pía is currently in default as it failed to make several payments to Seagrape that became due throughout the past year, going back as far as March 2015. Seagrape has held off on foreclosing on the entire project up until this point based on representations made by Kaleil (and the entities he represents) that this funding round will ensure Seagrape is paid in full."

74.     On January 17, 2016, Mullen emailed Tuzman directly, stating: "Please confirm that you agree you and all of your companies and all of your entities owe me the $5M++ that I provided to you over the years. Not only have you promised that all of your entities and trusts and such will personally guarantee, but you swore on our friendship too. Please confirm that you agree and acknowledge that you are in default, and that you recognize and appreciate that I have stayed at bay and not instituted foreclosure or tried to squeeze you and make you uncomfortable. Instead, at a heart-beat, I wired you $400,000 extra on top of all of this as soon as you asked, I then wired an additional $41,000 as soon as you asked... and you swore to me verbally, in writing, etc, that you will ensure me perfect comfort, no negotiations, and that I had your sincere appreciation."

75.     In early 2016, Tuzman, Davi and Blaurock stated that KIT Capital had received a number of offers for the Project in the $20 million range, including from Sutton Park and Royal Property Group. However, Tuzman, Davi and Blaurock were not interested in these offers, because

they would not result in any substantial payment to they and KIT Capital as the residual equity owners. Thus, the OP Defendants did not pursue the offers.

76.     On July 15, 2016, Tuzman appeared at a bail hearing in New York City, before the Honorable Frank Maas, at which attorneys representing the United States revealed that Tuzman had homes in Prague, the South of France and Colombia, as well as a substantial luxury watch and car collection. Indeed, Tuzman appeared at the hearing wearing a $70,000 limited edition Patek Phillippe watch, which he purchased in 2015, and was of a type that is only sold to an owner of substantial collection of other Patek Philippe watches. In 2015, Tuzman also purchased at least two Mercedes Benz automobiles in Columbia with funds from KIT Capital. The Government also learned from witnesses that Tuzman had "Multiple Bentleys, multiple Range Rovers, multiple cars all around the world."

77.     It also was revealed in court that between February and May 2015, Tuzman had spent no less than $379,000 on apparent personal items using KIT Capital's American Express Black Card, as follows:

> February 15, in one week he spent $22,000 on clothing in Switzerland. That includes over $7,000 on a fur shop in Zurich. Later that week he spent thousands of dollars on clothing in Monte -- in Monte Carlo. And then he charged $10,000 in the Cayman Islands. In March 2015 he spent $33,000 in a yacht club in the south of France. Weeks later thousands of dollars on clothing in Beirut, Lebanon. After that, $43,000 at Christy's, the auction house, in the UAE. March 27th, 2015 he spent $29,000 at a jeweler in Barcelona, $45,000 the very next day, Your Honor, at another jeweler in Barcelona. And then after that, the following week, $35,000 on more jewelry in Barcelona. So in all in one week there were $110,000 worth of jewelry purchases on the corporate American Express black card that he's carrying in the KIT Capital name. May 2015 he spent $96,000 on a car in Columbia. In July 2015 he spent $48,000 in jewelry in Greece and then later that month in July he spent $11,000 at a Bentley dealership in Cannes.

78.     Evidently, when Tuzman asked Mullen for $441,000 as a "backstop" for KIT Capital upon his arrest, it was not to keep the Project on track, but to cover KIT Capital's enormous American Express Black Card bill for these grotesque personal luxury items.

**H.  GACP Signs a Letter of Intent to Purchase the Project**

79.     On August 23, 2016, a potential purchaser, GACP Latin America Partners, LLC ("GACP"), based in Florida, entered into a non-binding Letter of Intent (the "LOI") to purchase the Project based upon a valuation of the Project as completed at $50.2 million, consisting of an upfront purchase of shares and a commitment to fund the completion of development.

**I.  The Credit Security Agreement**

80.     In connection with entering into the LOI with GACP, Seagrape agreed to enter into a Credit Security Agreement, dated as of August 25, 2016, the principal purpose of which was to induce Seagrape to forbear from foreclosing upon the Project for a limited time, to enable GACP to execute the contemplated purchase of the Project.

81.     The CSA was entered into by Seagrape, as lender, and OP BVI, KIT Capital, Obra Pia Management, GP ("Manager"), the Branch (collectively, the "OP Entities") and Tuzman, as "Debtors." The CSA specifically incorporated terms from the Addendum and Investment Agreement, including the guaranty and attorneys' fees provisions.

82.     The CSA provided that, as of July 1, 2016, Seagrape was due the sum of $4,694,806 (the "Cash Amount Due"), earning interest commencing August 1, 2016 at a rate of 15% per annum. In addition, under the CSA, OP Feeder issued Seagrape an additional 137.5 LP Units, for a total of 237.5 LP Units which, as of July 31, 2016, had a value of $2,882,018.00. CSA § 2.

83.     In connection with agreeing to accept the additional 137.5 LP Units in OP Feeder, Seagrape relied upon the OP Defendants' prior misrepresentations and omissions concerning the

Project, including that there was $19 million in "hard cash" invested into the Project, of which Tuzman himself had invested over $10 million.

84.     The CSA provided that Seagrape would temporarily forbear from foreclosing upon the Project (the "Secured Assets") until a stipulated "Foreclosure Date" of January 2, 2017. CSA § 11. The parties agreed that, in the event of a partial payment to Seagrape of $1,000,000, the Foreclosure Date would be extended to March 31, 2017. CSA § 11. No further extension or forbearance was provided or agreed. CSA § 11.

85.     Once the Foreclosure Date arrived, the OP Entities committed that they would "fully cooperate to facilitate Seagrape's foreclosing on the property and shall not block such foreclosure or cooperate with anyone seeking to block it." CSA § 11.

86.     Section 12 of the CSA provides that the agreement was governed by New York law, and that the parties agreed to submit to personal jurisdiction in any New York State or federal court sitting in the Borough of Manhattan in the City of New York.

### J.  The Senior Loan and Subordination Agreement With GACP

87.     In October 2016, GACP agreed to provide OP BVI with a bridge loan in the amount of $1,500,000 (the "Senior Loan"), to fund a $1,000,000 payment to Seagrape, as well as certain expenses of the Project.

88.     To enable GACP to make the Senior Loan, the parties entered into a Subordination Agreement, dated as of October 14, 2016 (the "Subordination Agreement"), under which Seagrape (among other lenders) agreed to subordinate its claim for the Cash Amount Due to the Senior Loan. Such subordination explicitly was "for the benefit of and enforceable by the Senior Lender." Subordination Agreement § 1(a).

89.     Consistent with the CSA, the Subordination Agreement provides that Seagrape would not foreclose on the Secured Assets before the Foreclosure Date of March 31, 2017. The

Agreement further states that each subordinated lender—including the OP Entities—agrees "not to declare a default with respect to any Subordinated Loan or exercise any rights with respect to any collateral securing the Subordinated Loans without providing the Senior Lender at least three (3) months advance notice."

90.     Other than the March 31, 2017 date and the notice requirement, the Subordination Agreement does not limit Seagrape's rights as a creditor under the CSA, Addendum and Investment Agreement.

91.     Section 12 of the Subordination Agreement provides that the agreement was governed by New York law, and that the parties agreed to submit to personal jurisdiction in any New York State or federal court sitting in the Borough of Manhattan in the City of New York.

**K.  Seagrape Gives Notice of its Intent to Declare a Default and Enforce its Rights**

92.     After execution of the Subordination Agreement, GACP made the Senior Loan and funded the payment of $1,000,000 to Seagrape, which extended the Foreclosure Date to March 31, 2017.

93.     However, upon further diligence, GACP substantially reduced the amount of its original offer. In an Amendment to the LOI, dated December 5, 2016, GACP reduced its valuation of the Project from $50.2 million to $43.9 million, and agreed (a) to purchase shares for $20.85 million; and (b) to fund no more than $18.7 million to complete the Project.

94.     Despite over six months of forbearance by Seagrape, Tuzman failed to close a transaction with GACP by March 31, 2017. Accordingly, by letter dated April 27, 2017 (the "Senior Lender Notice"), Seagrape provided formal written notice to GACP of its intent to declare a default under the Loan Agreements, and to proceed in enforcing all of its rights, including against the Secured Assets. The Senior Lender Notice stated:

[T]his letter, in accordance with the terms and conditions of the last sentence of Section 1(a) of the Subordination Agreement, also serves as the required advance written notice by Seagrape to GACP that Seagrape intends to declare a default by, among other parties, Borrower under Seagrape's Subordinated Loans and otherwise exercise any and all rights and remedies with respect to any collateral securing said Seagrape Subordinated Loans (which may include, without limitation, the filing of a foreclosure action in Colombia). The intended claim of default arises as a result of the failure by Debtors (as defined in that certain Credit and Security Acknowledgement dated August 25, 2016 (Credit Agreement Effective Date) referenced in Section 1(b) of the Subordination Agreement (Credit Agreement)) to pay Seagrape the Cash Amount Due (together with all fees, interest and penalties that have accrued since the Credit Agreement Effective Date) (collectively, Outstanding Cash Amount Due) by the March 31, 2017 extended Foreclosure Date.

95.     After the Senior Notice Letter, Tuzman continued negotiating with GACP, but GACP further reduced its valuation of the Project to less than $30 million. Tuzman began colluding with GACP to induce Seagrape to accept less than a full recovery, so that KIT Capital could receive a recovery on its residual equity. Confirming the cozy nature of the relationship between Tuzman and GACP, later Tuzman admitted to Mullen that he was using a portion of the funds that GACP had loaned to OP BVI to cover his "basic living expenses."

96.     In an email, dated May 5, 2017, Tuzman, Blaurock and Davi informed Hybrid Round investors, including Seagrape, that GACP and KIT Capital had conducted "a detailed joint legal analysis" to determine the timeframe for effective foreclosure efforts by Seagrape.

97.     Thereafter, in an email dated October 22, 2017, obtained by Mullen, Tuzman suggested to GACP that rather than insist upon a further reduction of the total price, GACP continue to "offer the total of the previous LOI valuation ($27.824M), but GACP and KIT collaborate on getting creditors to receive less than face value and KIT Capital (Nevis) (Obra Pia's

owner) shares a 50% benefit with GACP on any savings realized from face value, and the other 50% just reduces the amount that you pay for the asset.".

98.     In other words, Tuzman proposed a secret side-deal to dupe creditors, including Seagrape, to accept a substantial haircut in order to fund a return for Tuzman's entity, KIT Capital, as an equity holder, and a discount to GACP. A subsequent spreadsheet prepared by KIT Capital indicates that Tuzman thought it appropriate for Seagrape to take a 56% haircut on the amount owed, from $5.4 to $2.4 million, so that KIT Capital could achieve a $5.3 million dollar profit

### L.  The SDS Complaints

99.     On November 6, 2017, Seagrape filed a complaint concerning financial mismanagement and irregularities on the Project with the Colombian Superintendencia de Sociedades ("SDS").

100.     Upon Seagrape's complaint, the Colombian SDS found a number of irregularities in the accounting and management of the Branch. *See* Resolution 5 at 1. Among them, the SDS found that the Branch failed to record as debts on its books (1) the OP Defendants' debt to Seagrape in the amount of US $ 4.694.806; (2) an obligation in the amount of $972.350.075; and (3) an obligation in the amount of $846.615.913. *See id.* at 2. In addition, the SDS found discrepancies between sworn certifications concerning the value of the properties acquired for the Project, and the value ascribed to those properties in the company's financial statements, indicating that there is a "critical situation of accounting" and mandating that the company be supervised by the SDS. *See id.* Confirming the "critical situation," the SDS noted that progress on the Project had "suspended" since September 2017, and that there had been a "stoppage of payments." *See id.* at 2 & 4.

101.     As a result, by order dated January 18, 2018, the SDS required the Branch to submit an "improvement plan" to address four irregularities and deficiencies: "(1) Non-recognition of the

accounting obligation to SEAGRAPE INVESTORS LLC; (2) Inconsistency in the value of assets; (3) Non development of the object of the subsidiary; [and] (4) Stoppage of payments." *See id.* at 4.

### M. Seagrape Serves the Statutory Demand

102.    On January 21, 2019, Seagrape served upon OP BVI a Statutory Demand under section 155 of the [BVI] Insolvency Act, 2003, seeking payment of the sum of $5,099,917.49. Under BVI law, if payment is not made within 21 days of such a demand, the debtor may be placed into liquidation.

103.    After Seagrape served the Statutory Demand, OP BVI brought a legal proceeding in the BVI (the "BVI Proceeding") seeking to set aside the Demand on grounds that OP BVI purportedly had off-setting counterclaims against Seagrape arising under New York law. Among other things, OP BVI falsely claimed that Seagrape had not served the Senior Lender Notice at least three months before proceeding to enforce its rights.

104.    In connection with the BVI Proceeding, Defendant Joseph P. Garland, an New York attorney, submitted an Affidavit, dated February 15, 2019, which was prepared in Westchester County, New York, and notarized by a licensed notary in Rockland County, New York.

105.    In the Affidavit, Garland offered his opinion, as a member of the bar of the State of New York, on the interpretation of New York law as it applied to the application. In in ¶ 24 of his Affidavit, Garland misleadingly asserted that "[a]ccording to Mr. Tuzman, Seagrape did not give the required notice and thus it did not have, and does not have, the right to seek payment because the opportunity to cure any default has not begun." As a result, Garland contended, that "By failing to provide the requisite notice, Seagrape breached its obligations to the Obra Entities." *Id.* ¶ 40. Citing the misrepresentations of another witness, Garland also falsely represented to the court in ¶

28 of his Affidavit that the SDS complaints were improper and the "SDS inquiry/investigation did not turn up any malfeasance."

106.    Based upon these objectively false statements of fact, Garland contended in his Affidavit that—rather than being liable to Seagrape under the CSA—OP BVI had meritorious off-setting counterclaims against Seagrape for breach of contract, breach of the implied duty of good faith and fair dealing and breach of a best efforts provision in the CSA, which provided that Seagrape would use its best efforts to assist in any sale of the Project.

107.    Confused by the false statements of fact in Garland's affidavit, the BVI court found that OP BVI's claims potentially might have merit, stating "it would appear that the complaint to SDS might have been premature."

108.    However, uncertain of the merits of claims under New York law, the BVI court abstained from attempting to adjudicate them, and conditionally set aside the Statutory Demand—but only if OP BVI commenced action on its claims in New York within thirty days. If OP BVI failed to do so—or failed to diligently pursue its alleged claims in New York—the court ordered that OP BVI's debt to Seagrape would be "payable immediately."

**N.  Defendants File a Fraudulent Complaint In New York**

109.    Rather than pay their obligations to Seagrape—which Tuzman and other agents of Plaintiffs previously conceded on countless occasions, including in Pedley's December 29, 2015 email—Plaintiffs elected to commence a meritless lawsuit in New York, captioned *Obra Pia Ltd., et al. v. Seagrape Investors LLC and Edward V. Mullen*, U.S.D.C., S.D.N.Y., Civ. Action No. 1:19-cv-07840 (the "Frivolous Action"), solely for purposes of delay and to tarnish Mullen's good name and business reputation.

110.    Consistent with the Garland Affidavit in the BVI Proceeding, in its Complaint in the Frivolous Action, ignoring the Senior Notice Letter, Defendants Garland and Kenneth Elan

falsely contended that the SDS Complaints and Statutory Demand were premature—and thus in breach of the Subordination Agreement—because "[u]pon information and belief, Seagrape failed to provide the notice it was required to give pursuant to the Subordination Agreement before the filing of the SDS Complaint and the submission of the Statutory Demand." Complaint ¶ 76. Defendants Garland and Elan also alleged that Seagrape's duly agreed enforcement efforts breached the best efforts provision and the implied duty of good faith and fair dealing in the CSA.

111.    Upon serving a Rule 11 warning letter on August 22, 2019, Garland and Elan withdrew as counsel in the Frivolous Action. Conceding the frivolous nature of the original complaint, Defendants' new counsel filed a First Amended Complaint which does not dispute the Senior Notice Letter and asserts entirely new and different claims, which were not presented to the BVI court or alleged in the original complaint.

112.    As a result of the BVI Proceeding and Frivolous Action, Seagrape has suffered substantial damages, including substantial attorneys' fees and costs, which continue to accrue.

**O.  The OP Defendants Restructure KIT Capital in Breach of the CSA**

113.    Section 6 of the CSA provides, with certain exceptions not applicable here, that "any modification to the property rights of any of the Debtors on the Secured Assets, including any sale, mortgage, encumbrance, lien, or establishment of trust agreements in favor of any party, including equity holders, other than Seagrape, among others, must be first authorized in writing by Seagrape unless at the closing of such transaction or transactions the Cash Amount Due is immediately paid to Seagrape in full."

114.    On October 11, 2019, following an initial conference in the Frivolous Action, counsel to the OP Defendants and Tuzman together stated that there had been a "restructuring" of the Project, which involved an injection of new capital. Thereafter, in a text message to Mullen

27

later the same day, Tuzman wrote that there is "another party in the mix now," and a "new cap[ital] structure on our side."

115.    The alleged restructuring was not done upon prior notice and authorization of Seagrape and did not involve a complete payoff of the Cash Amount Due to Seagrape. Thus, the alleged restructuring was in breach of the CSA.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 10(b) and Rule 10b-5, Against Defendants Tuzman, KIT Capital Dubai, OP Feeder and OP BVI)

116.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

117.    This Count is asserted against Defendants Tuzman, KIT Capital Dubai, OP Feeder and OP BVI for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

118.    In connection with the purchase and sale of 100 LP Units in OP Feeder in the Addendum, between August and November 28, 2014, and the purchase of 137.5 LP Units in OP Feeder in the CSA, on August 25, 2016, Defendants Tuzman, KIT Capital Dubai, OP Feeder and OP BVI: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

119.    To induce Plaintiff's purchase of 237.5 LP Units in OP Feeder, Defendants Tuzman, KIT Capital Dubai, OP Feeder and OP BVI made the materially false representations set forth above. Defendants Tuzman, KIT Capital Dubai, OP Feeder and OP BVI knew these representations were false or disregarded with severe recklessness that they were materially false and misleading. The misrepresentations include:

- The false representation of fact, made on July 3, 2014, that the Project was exceptionally profitable, and had nearly tripled in value since 2010.

- The false representation of fact, made on July 3, 2014, and repeated numerous times thereafter, that Tuzman had personally invested over $10 million to purchase all five parcels of real estate comprising the Project, when in fact Tuzman had paid no more than USD $5.5 million.

- The false representation of fact, made on July 3, 2014, that Tuzman had obtained a $20 million dollar bank loan to develop the Project.

- The false representation of fact, made on July 3, 2014, that Tuzman had obtained a $5 million equity investment from Mubadala.

- The false representation that Plaintiff's investment of $1 million, to acquire LP Units in OP Feeder would be used to develop the Project, rather than to fund personal expenses of Tuzman.

- The false representations of fact in the DTZ Memorandum—based upon representations by Tuzman, Davi and Blaurock—that KIT Capital "began construction of the project on in November 2014 and has already invested $27.8 million in equity to date," including $22.5 million in "pre-development" land acquisition costs, $2,971,000 in construction costs and $2,522,000 in indirect development costs.

120.    Plaintiff relied on these misstatements to its detriment. Had Plaintiff known the truth, Plaintiff would not have purchased the LP Units or, at a minimum, Plaintiff would not have purchased the LP Units at the price it paid.

121.    As a direct and proximate result of the false and misleading statements of Defendants Tuzman, KIT Capital Dubai, OP Feeder and OP BVI, Plaintiff suffered damages in an amount to be proven at trial, but no less than the $1 million dollar purchase price of the LP Units, Plaintiff's consequential damages, and exemplary damages.

## SECOND CLAIM FOR RELIEF

### (Common Law Fraud Against Defendants
### Tuzman, KIT Capital Dubai, OP Feeder and OP BVI)

122.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

123.    To induce Plaintiff's purchase of 100 LP Units in OP Feeder in the Addendum, on November 28, 2014, and the purchase of 137.5 LP Units in OP Feeder in the CSA, on August 25, 2016, Defendants Tuzman, KIT Capital Dubai, OP Feeder and OP BVI made the materially false representations set forth above.

124.    In addition, on September 7, 2015, to induce Plaintiff to loan KIT Capital the sum of $400,000—and, thereafter, an additional $41,000—Tuzman falsely represented to Plaintiff that the funds were to be used as a "backstop" to cover payroll and other expenses, to protect the Project.

125.    In connection with his request for a $400,000 loan from Plaintiff, Tuzman did not disclose that he had been indicted for federal securities fraud.

126.    At the time of his request, Tuzman did not disclose to Plaintiff that KIT Capital had incurred at least $379,000 in personal expenses for luxury items on its American Express Black Card, and that the principle purpose of the loan was, not to fund the Project, but to pay Tuzman's egregious personal expenses.

127.    Due to their relationship of trust and confidence, Plaintiff reasonably relied upon Tuzman's affirmative misrepresentation concerning the reason and use for the loan, and dutifully lent Tuzman/KIT Capital the sum of $441,000.

128.    As a direct and proximate result of the foregoing fraudulent statements, omissions and concealments, Plaintiff has been damaged in an amount to be proved at trial, along with consequential and exemplary damages.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract Against Defendants KIT Capital, KIT Capital Dubai, OP BVI, OP Management, the Branch and Tuzman)

129.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

130.    Pursuant to the terms of the CSA, Addendum and Investment Agreement, as of July 1, 2016, Seagrape was due the sum of $4,694,806 (the "Cash Amount Due"), earning interest commencing August 1, 2016 at a rate of 15% per annum. After the payment of the sum of $1,000,000 on October 18, 2016, the Cash Amount Due was reduced to $3,694,806.00. As of August 1, 2019, including accrued interest, the Cash Amount Due was no less than $5,391,452.87.

131.    Pursuant to the terms of the § 12 of the Investment Agreement, as incorporated into the Addendum and CSA, Plaintiff is entitled to recover all costs incurred in connection with defending or enforcing any of Plaintiff's rights thereunder, including "attorney's fees (including such fees incurred in appellate, bankruptcy or insolvency proceedings), with or without the institution of any action or proceeding, and in addition [] all costs, disbursements and allowances provided by law."

132.    As set forth in § 1 of the CSA, the under the terms of the CSA, Investment Agreement and Addendum, Defendants KIT Capital, KIT Capital Dubai, OP BVI, OP Management, the Branch and Tuzman did not pay the amounts owed under the Investment Agreement and Addendum when due, and thus are in breach of those agreements.

133.    Under § 11 of the CSA, Plaintiff agreed to forbear on the enforcement of its right to payment under the CSA, Investment Agreement and Addendum until no later than March 31, 2017.

134.    Plaintiff duly provided the Senior Lender Notice to GACP on April 27, 2017.

135.    Defendants breached the CSA by bringing the BVI Proceeding to block the enforcement of Plaintiff's rights as a creditor, in violation of their duty under § 11 of the CSA to

"fully cooperate to facilitate Seagrape's foreclosing on the property and [to] not block such foreclosure or cooperate with anyone seeking to block it."

136.    Defendants further breached the CSA by engaging in a "restructuring," including the injection of new capital, without the prior notice and consent of Plaintiff.

137.    As a direct and proximate result of the foregoing breaches of contract by Defendants Tuzman, KIT Capital Dubai, OP Feeder and OP BVI, Plaintiff suffered damages in an amount of the Cash Amount Due, with accrued interest thereon, along with an award of all of Plaintiff's attorney's fees and costs in connection with this action, as well as all of Plaintiff's prior efforts to enforce or defend its rights under the CSA, Investment Agreement and Addendum.

## FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duties Against Tuzman, Blaurock, Davi, KIT Capital, OP Feeder and OP Manager)

138.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

139.    At all relevant times, Defendants Tuzman, Blaurock and Davi were senior officers of KIT Capital, with Tuzman serving as President and CEO, Davi serving as Chief Financial Officer, and Blaurock serving as General Counsel.

140.    At all relevant times, KIT Capital was the 100% owner of both OP Manager, which was the General Partner of OP Feeder, which in turn held a convertible note issued by OP BVI.

141.    At all relevant times, KIT Capital was the 100% owner of OP BVI, which was the 100% owner of the Branch, which in turn held title to the Project.

142.    As a result of Plaintiff's investment in the LP Units of OP Feeder, Defendants Tuzman, Blaurock, Davi, KIT Capital, OP Manager and OP Feeder owed Plaintiff fiduciary duties of care and loyalty.

143.    Defendants Tuzman, Blaurock, Davi, KIT Capital, OP Manager and OP Feeder breached their fiduciary duties to Plaintiff, among other things, by:

- Making the foregoing misrepresentations and omissions, set forth in the First and Second Claims for Relief, above.

- Allowing KIT Capital to apply at least $379,000 of invested funds on personal luxury items, such as clothing and watches, that could have no proper purpose in a real estate development.

- Allowing KIT Capital to apply a portion of the funds lent by GACP to pay Tuzman's own personal living expenses.

- Falsely representing to investors, including Plaintiff, that KIT Capital had invested $19 million in "hard cash" on the Project, when in fact KIT Capital had invested substantially less than that amount.

- Following Tuzman's indictment, refusing to accept reasonable offers for the sale of the Project, which would have fully paid Plaintiff, in pursuit of an unlikely recovery on the residual equity KIT Capital and Tuzman.

- Colluding with GACP to induce Plaintiff and other investors to accept a haircut on their returns in exchange so that GACP could achieve a lower effective purchase price and KIT Capital/Tuzman could achieve an unjustified return on equity.

- Resisting foreclosure by means of the Statutory Demand under BVI law.

- Failing to provide Plaintiff with contemporaneous updates and financial information, including concerning an apparent restructuring of the Project.

144.    As a direct and proximate result of the foregoing breaches of fiduciary duties by Defendants Tuzman, Blaurock, Davi, KIT Capital, OP Manager and OP Feeder, Plaintiff suffered damages in an amount to be proven at trial, along with Plaintiff's consequential damages, and exemplary damages.

## FIFTH CLAIM FOR RELIEF

### (Judiciary Law § 487 Against Defendants Garland and Elan)

145.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

146.    As set forth above, Defendant Garland engaged in deceit and collusion in New York with the intent to deceive both the BVI court in the BVI Proceeding and the court in the Frivolous Action. Likewise, Defendant Elan engaged in deceit and collusion in the State of New York with the intent to deceive the court in the Frivolous Action.

147.    Such deceit included knowingly basing Garland's Affidavit in the BVI Proceeding and the Complaint in the Frivolous Action upon materially false facts, for the purpose, and with the effect, of blocking Plaintiff's due payment under the terms of the CSA, Investment Agreement and Addendum.

148.    The deceit by Garland and Elan proximately cause Plaintiff's actual damages, in the form of substantial attorneys' fees and costs expended in connection with both the BVI Proceeding and the Frivolous Action.

149.    By reason of the foregoing, Plaintiff is entitled to treble damages resulting from the deceit by Garland and Elan in connection with the BVI Proceeding and Frivolous Action.

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Award Plaintiff all of its compensatory and consequential damages in an amount to be proved at trial;

B.  Award Plaintiff appropriate treble damages upon Plaintiff's costs in connection with the BVI Proceeding and Frivolous Action, under Judiciary Law § 487, against Defendants Garland and Elan;

C.  Award Plaintiff its appropriate punitive damages;

D.  Award Plaintiff all appropriate pre-judgment and post-judgment interest;

E.  Award Plaintiff all of its reasonable attorney's fees, expenses, expert witness fees, and court costs pursuant to the parties' contracts and as otherwise permitted by law; and

F.  Award any such other and further relief as the Court may deem just and proper.

Plaintiff demands a trial by a jury on all issues so triable.

Dated:  New York, New York
        October 21, 2019

PRESS KORAL LLP

By: _____
        Matthew J. Press

        641 Lexington Avenue, 13th Floor
        New York, NY 10022
        Telephone:  (212) 922-1111
        Facsimile:  (347) 342-3882
        mpress@presskoral.com

        *Attorneys for Plaintiff*

## JURY DEMAND

PLEASE TAKE NOTICE that Plaintiff demands a trial by jury on all issues so triable.

DATED:   New York, New York
              October 21, 2019

                              Respectfully submitted,

                              PRESS KORAL LLP

By: _____
        Matthew J. Press
        641 Lexington Avenue, 13th Floor
        New York, NY  10022
        Telephone:  (212) 922-1111
        Facsimile:   (347) 342-3882
        mpress@presskoral.com

        *Attorneys for Plaintiff*