USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/25/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SEAGRAPE INVESTORS LLC,

                Plaintiff,

      v.

KALEIL ISAZA TUZMAN, KIT CAPITAL,
LTD., KIT CAPITAL (NEVIS) LLC, OBRA
PIA LTD., OBRA PIA (US) FEEDER, LP,
OBRA PIA MANAGEMENT, GP, LTD.,
OBRA PIA LTD., SURCUSAL
COLOMBIA, AMANDA BLAUROCK,
ROSARIO DAVI, JOSEPH P. GARLAND,
AND KENNETH A. ELAN,

                Defendants.

No. 19-CV-9736 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Seagrape Investors LLC ("Seagrape") brings this related action against Defendants Kaleil Isaza Tuzman ("Tuzman"), KIT Capital, Ltd. ("KIT Capital"), KIT Capital (Nevis) LLC ("KIT Nevis"), Obra Pia Ltd. ("Obra Pia"), Obra Pia (U.S.) Feeder, LP ("OP Feeder"), Obra Pia Management, GP, Ltd. ("OP Manager"), Obra Pia Ltd., Surcusal Colombia ("OP Colombia," and collectively with the aforementioned Defendants, the "OP Defendants"), as well as individuals Amanda Blaurock (KIT Nevis's General Counsel), Rosario Davi (KIT Nevis's CFO), and Joseph Garland and Kenneth Elan (the OP Defendants' prior counsel).[1]   Against certain of the OP Defendants, Seagrape asserts claims for federal securities fraud under Section 10(b) and Rule 10-b5,

---

[1] This action is related to *Obra Pia Ltd. et al. v. Seagrape Investors LLC et al.*, No. 19-cv-7840 (the "Obra Pia Action"), in which this Court is simultaneously issuing an opinion granting Defendants' motion to dismiss (the "Obra Pia Opinion"), *see* Obra Pia Action Dkt. 85.  The Obra Pia Action was initially commenced in New York state court on June 24, 2019 and removed to this Court on August 21, 2019.  An amended complaint in that action was filed on September 18, 2019 (the "Obra Pia Complaint").

common law fraud, and breach of contract, and—along with Defendants Blaurock and Davi—a claim for breach of fiduciary duties.  As to Defendants Garland and Elan, Seagrape asserts claims for aiding and abetting breach of fiduciary duty, as well as violations of New York Judiciary Law § 487.

Now before the Court are three motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6): one filed by the OP Defendants, one filed by Garland, and one filed by Elan.  For the reasons that follow, the OP Defendants' motion is granted in part and denied in part, and Garland and Elan's motions are both granted in full.

## BACKGROUND

### I.     Factual Background

The following facts are drawn from Seagrape's First Amended Complaint (the "FAC" or "Complaint"), Dkt. 35, and are assumed to be true for the purpose of this motion.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

### A.  Prior Relationship Between Mullen and Tuzman

According to the Complaint, Tuzman and Edward Mullen, Seagrape's principal, have had a "long history of friendship and business dealings" since the 1990s.  *See* FAC ¶ 25.  Seagrape asserts, for instance, that prior to 2013, Mullen "agreed to lend and invest various sums of money to Tuzman to fund one or more of his transactions."  *Id.* ¶ 28.  As to his prior ventures, Seagrape maintains that, between 2001 and 2010, Tuzman bought and sold technology and media-related companies through a vehicle named "KIT Capital, Inc.,"[2] and that he established an internet-video technology company named KIT Digital, Inc. ("KIT Digital").  *Id.* ¶ 27.

---

[2] Seagrape refers to both Plaintiff KIT Capital (Nevis) LLC and KIT Capital, Inc.—an entity that does not appear to be a party in this case—as "KIT Capital."  *See* FAC ¶¶ 13, 27.  It refers to Plaintiff KIT Capital, Ltd. as "KIT Capital Dubai." *See id.* ¶ 12.  For the avoidance of doubt, the Court will refer to Plaintiff KIT Capital, Ltd. as "KIT Capital," as it did in the Obra Pia Opinion, and to Plaintiff KIT Capital (Nevis) LLC as "KIT Nevis."   To the extent the Court can discern when Seagrape is referring to KIT Capital, Inc., as opposed to KIT Capital, Ltd. or KIT Capital Nevis (LLC), it will refer to it simply as "KIT Capital, Inc."

### B. The Investment Agreement

On May 1, 2013, Mullen, his entity Oaktree Partners, LLLP ("Oaktree"), Tuzman, and his entity KIT Media, Ltd. ("KIT Media") entered into the Investment Agreement. *Id.* ¶ 29; *see also* OP FAC Ex. 1 ("Investment Agreement").[3]   Seagrape asserts that Mullen and Oaktree entered into the Investment Agreement "as lenders."  *See* FAC ¶ 29.  Pursuant to the Agreement, Mullen and Oaktree were identified as "Investors," while KIT Media was listed as the "Recipient" and Tuzman the "Guarantor."  Investment Agreement at 1.  The Investment Agreement specified that Mullen and Oaktree had "previously [] invested the sum of $1,885,513" (the "Prior Amount"), and that they "agreed to lend KIT Media" an additional $1,850,000 (the "New Amount").  *See* FAC ¶ 29 & Investment Agreement at 1.  In connection with the "Prior Amount," the parties agreed that KIT Media would pay $2,161,492, including a "guaranteed return" of $275,979, by December 31, 2013 (the "Due Date"), and that, upon such payment, Mullen and Oaktree would "transfer their previously owned shares in KIT Media to KIT Capital."  FAC ¶ 30 & Investment Agreement § 3.1.  The parties agreed further that, by the Due Date, KIT Media would pay the New Amount to Mullen and Oaktree, in addition to a "return based on a 20% share in [KIT Media's] profits over the time period of such investment."  *Id.*  As security for both the Prior Amount and the New Amount, Tuzman agreed to grant Mullen a "first mortgage and security interest" on two properties—identified as the "Collateral"—in Cannes, France and Park City, Utah.  *See* Investment Agreement §§ 1.1, 5.1 & FAC ¶ 31.  According to Seagrape, Tuzman "represented to Mullen that these two properties provided ample security for the amounts due under the Investment Agreement."  FAC ¶ 31.  Additionally,

---

[3] The Court finds that the relevant agreements cited and described in the Complaint are "incorporated into the complaint by reference." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Because the Obra Pia Complaint attached these documents as exhibits, but the Seagrape Complaint did not, the Court refers to the Obra Pia Complaint's exhibits, and does so by using the "OP FAC Ex." prefix.

Seagrape maintains that "Tuzman's pledge of these security interests confirms that the Investment Agreement was in the nature of a loan." *Id.*

Pursuant to the Investment Agreement, Tuzman agreed to "personally guarantee each of the obligations of KIT Media and its holding company, including payment of the Prior and New Amounts." FAC ¶ 32 & Investment Agreement § 5.6. Section 5.6 provided further that the guarantee contained therein "shall survive the death, disability, insolvency, bankruptcy and transfer for the benefit of creditors or otherwise of [Tuzman, as the] Guarantor," and that it would be "binding upon and become the obligation of [Tuzman's] heirs, executors, personal representatives, trustees, successors and assigns." *Id.*

The Investment Agreement expressly provided for certain situations that would constitute a "default." *See* Investment Agreement § 7.2. Among other things, a default would occur if KIT Media failed "to make any of its payment obligations under the Agreement by the Due Date," as well as if Tuzman failed to "perform any of his obligations under the Agreement, including [by] failing to perfect a first mortgage on the Collateral." FAC ¶ 33.

The Investment Agreement contains a New York choice-of-law provision, which provides that the Agreement "shall be governed by and construed in all respects in accordance with the laws of the State of New York." Investment Agreement § 11.

Seagrape alleges that, in 2013, KIT Media defaulted on its payment obligations under the Investment Agreement, and that Tuzman "likewise defaulted on his obligation to execute documents perfecting [Mullen and Oaktree's] security interest in the Collateral." FAC ¶ 36. Despite these defaults, Tuzman allegedly "assured Mullen that business was going well and that he would soon be paid." *Id.* Seagrape maintains that, because of their "close personal friendship," Mullen "allowed Tuzman additional time" to satisfy his, and his entity's, obligations under the Investment Agreement. *See id.*

### C.  The Project

As detailed in the Obra Pia Opinion, this dispute arises from Seagrape's investment in the development of a luxury hotel project in Cartagena, Colombia, known as "Convento Obra Pia" (the "Development" or the "Project").  *See id.* ¶ 1.  According to the Complaint, Tuzman first advised Mullen about the Project in approximately 2014, and at that point, he "began soliciting a loan or investment by Mullen into the Project."  *Id.* ¶ 37.  Seagrape alleges that Tuzman needed funding for the Project.  *See id.* ¶ 38.  It asserts further that Tuzman himself "held a substantial equity position" in the Project and therefore "stood to benefit personally from any funding by Mullen—to the extent that such funding enabled Tuzman to complete and sell the Project, and to achieve a return on his equity."  *See id.*  As to Mullen in particular, Seagrape alleges that Tuzman "stood to benefit from inducing Mullen to fund the Project" because "Tuzman and others freely used the cash and assets of the Project for their own personal benefit, including to purchase hundreds of thousands . . . of dollars' worth of luxury goods" that had "no proper purpose in a real estate development."  *Id.*

### D.  Tuzman's Alleged Misrepresentations Regarding the Project

Seagrape asserts that it subsequently discovered that Tuzman had "fraudulently induced" it "into making the loans and investments" for the Project based on "materially false representations of fact concerning the Project, including vast overstatements of the amount that Tuzman and his entities had personally invested in the Project."  *Id.* ¶ 4; *see also id.* ¶ 38 (alleging that Tuzman "made a number of misrepresentations and omissions to induce Mullen to invest in and fund the Project").

First, Tuzman allegedly stated that he "held the Project through his ownership and control of [KIT Nevis] and [Obra Pia], the Colombian subsidiary of which . . . held title to five parcels of real estate, as well as all relevant construction licenses and entitlements, related to the Project."  *Id.* ¶ 39. He also allegedly stated that had a contract with Viceroy Hotel Group to "serve as the manager of a 102-key Viceroy-branded hotel."  *Id.* ¶ 40.  According to Seagrape, Tuzman also stated that he was

5

"forming a Real Estate Investment Trust" (a "REIT" or "Fideicomiso") in Colombia to "hold the Project," and that he was "in the process of filing registration documents with the Colombian securities authorities." *Id.* ¶ 43

Second, in an April 7, 2014 email, Tuzman purportedly explained to Mullen that KIT Capital had a $20 million "bank loan" "in place" and had begun work "about a month ago" with an "expected construction completion date" of December 2015, and that it had also received a "$5 million equity investment from Mubadala, an investment fund based in Abu Dhabi." *Id.* ¶ 41. Seagrape alleges that Tuzman made these representations even though he knew that "the $20 million bank loan was not 'in place' and Mubadala had not invested in the Project." *Id.* Seagrape contends further that it subsequently learned that "no construction at all took place on the Project until at least November 2014, thus there could not have been any substantial additional costs and expenses," and that "Mubadala had not invested $5 million in equity in the Project." *Id.* ¶ 53.

Third, in a July 3, 2014 email, Tuzman allegedly represented to Mullen that he had personally invested $10 million in the Project and that the existing property had been "appraised by the bank" in its current state at $27.5 million, i.e., "approximately three times Tuzman's alleged investment." *Id.* ¶ 42. He also again allegedly stated that he had obtained a $20 million bank loan to develop the property. *See id.* According to Seagrape, however, these "representations were materially false and misleading," *id.*, because, as Seagrape later discovered, Tuzman paid no more than $5.5 million to purchase all five parcels of real estate comprising the Project, not $10 million, *id.* ¶ 53, and a "$20 million bank loan had not been secured for the Project," *id.* ¶ 63. Seagrape also alleges that Tuzman "omitted to disclose" that he had "misapplied substantial sums provided by Mullen under the Investment Agreement to Tuzman's own personal expenses." *Id.* ¶ 42; *see also id.* ¶ 4 (alleging that Tuzman improperly "applied over $379,000 [] in invested capital to personal luxury items" with "no proper purpose in a real estate development," such as "cars, clothing and watches," and that he did so

with Defendants Davi and Blaurock's "acquiescence"); *id.* ¶ 81 (alleging that, between February and May 2015, Tuzman spent "no less than $379,000 on apparent personal items using [KIT Nevis's] American Express Black Card").  Seagrape asserts further that KIT Nevis had "far less financially at risk in the Project than Tuzman claimed," and that it had thus been "asked to make an outsized loan and investment of essentially the same amount as [KIT Nevis]/Tuzman," as opposed to the "fraction of the capital invested in the Project" that it thought Tuzman had invested.  *Id.* ¶ 54

### E.  The Hybrid Round

According to Seagrape, during a "luxury yacht trip in Turkey" in August 2014, Tuzman asked Mullen to invest in "a $6 million [] friends and family round of funding for the Project," known as the "Hybrid Round."  *Id.* ¶ 44.  Seagrape asserts that the Hybrid Round was "structured as a purchase of limited partnership units" (the "LP Units") in OP Feeder.  *Id.* ¶ 45.  OP Feeder "held a 12.5% promissory note issued by [Obra Pia], convertible into shares of [Obra Pia]."  *See id.*

On September 14, 2014, Tuzman provided Mullen with a "draft term sheet" and "draft disclosure documents" in connection with the Hybrid Round.  *See id.* ¶ 45.  Seagrape contends that neither the draft term sheet nor the draft disclosure documents "correct[ed] [Tuzman's] prior materially false and misleading statements."  *Id.*  Two days later, on September 16, 2014, Tuzman provided Mullen with a "draft Subscription Agreement for the LP Units of OP Feeder," which Seagrape maintains similarly "did not correct his prior materially false and misleading statements." *Id.*  On September 24, 2014, Tuzman gave Mullen a "revised draft version of the Hybrid Round Term Sheet and Subscription Agreement," which again "did not correct Tuzman's prior affirmative misrepresentations and omissions concerning the Project."  *Id.* ¶ 49.

On September 28, 2014, Tuzman provided Mullen with "an email investor letter," as well as "access to a complete library of documents related to the Hybrid Round offering" (the "Hybrid Round Documents").  *Id.* ¶ 50.  These documents, again, allegedly failed to "correct Tuzman's prior

affirmative misrepresentations and omissions concerning the Project." *Id.* Additionally, on November 12, 2014, Tuzman apparently sent Mullen "the latest version of the teaser, term sheet, LP agreement and investment flow chart," which likewise did not correct any such statements or omissions. *See id.* ¶ 51.

Seagrape also asserts that, in connection with the Hybrid Round, an entity in which Defendant Blaurock "holds an interest"—known as "New Col Holdings, LLC" or "New Col"—"received LP Units as an alleged commission in connection with Blaurock's alleged role in raising capital pursuant to the fraudulent Hybrid Round Documents." *Id.* ¶ 61. Although Seagrape acknowledges that "Blaurock did not procure Mullen or Seagrape as an investor," *id.*, it nonetheless contends that Blaurock "received through New Col over $200,000 in LP Units of OP Feeder," *id.* ¶ 62.

**F.  The Addendum**

Seagrape alleges that, on September 17, 2014, Tuzman emailed Mullen regarding a "setback on the Project." *Id.* ¶ 46. In particular, Tuzman explained that he needed additional funds in order to submit the Project's "REIT prospectus," and that he was "attempting to raise those funds, to eliminate the issue." *Id.* The next day, on September 18, 2014, Tuzman allegedly "proposed that Mullen lend the funds needed to pay the [requisite] taxes and permit expenses" in connection with the REIT application. *Id.* ¶ 47. He thus presented Mullen with a proposed amendment to the May 2013 Investment Agreement, under which Mullen "would extend a further loan of $343,646 to pay the taxes and expenses." *See id.* Tuzman also apparently "proposed to substitute the Project [itself] as the Collateral under the amended agreement." *See id.*

On September 19, 2014, the parties entered into an "Addendum to Investment Agreement" (the "Addendum"). *See id.* ¶ 48; *see also* OP FAC Ex. 2 ("Addendum") at 1 (identifying September 19, 2014 as the "Effective Date"). Seagrape maintains that the September 19, 2014 version of the Addendum was merely a "proposed draft," and that Mullen only "agreed in principle to [its] terms"

in September 2014.  *See* FAC ¶ 48.  According to Seagrape, "after reaching an agreement in principle, the parties continued to negotiate numerous terms of the Addendum, until a final executed version was reached on November 27, 2014."  *Id.*  Nonetheless, Seagrape alleges, Mullen entered into the Addendum based on "Tuzman's prior representations and omissions concerning the Project."  *Id.*[4]

Pursuant to the Addendum, Seagrape replaced Mullen and Oaktree as the "Investor" and OP Feeder replaced KIT Media as the "Recipient."  *See id.* ¶ 55.  Tuzman remained listed as a "Guarantor," although KIT Capital and Obra Pia were also added as "Guarantors." *See id.*  The Addendum noted that the Investment Agreement was "incorporated by reference into this Addendum," and provided in particular that "[a]ny terms in the [Investment] Agreement not explicitly changed or overwritten by this Addendum will continue to apply to the business dealings between the Parties."  Addendum at 1 & FAC ¶ 55.

In the Addendum, the Collateral in Cannes, France and Park City, Utah was replaced with "New Collateral," defined as four properties in Cartagena de Indias, Colombia that Obra Pia owned and that KIT Capital beneficially owned, *see* Addendum §§ 3.1, 3.2, which Seagrape alleges constituted the Guarantors' "interests in the Project," FAC ¶ 60.  According to Seagrape, the Guarantors had represented that such property was appraised at $28.2 million "by an appraisal firm appointed by a major Latin American banking institution."  *Id.*  Under the Addendum, OP Feeder and the Guarantors also expressly represented that, "to the best of their knowledge," the $28.2 million valuation was "a fair and reasonably accurate determination of the current Fair Market Value of such properties."  Addendum § 3.2 & FAC ¶ 60.

---

[4] According to Seagrape, under the "draft Addendum," it agreed to "apply a portion of the existing debt to the purchase of [$1 million] in LP Units in OP Feeder."  *See id.* ¶ 49.  To the extent the "draft Addendum" referenced herein differs from the executed Addendum attached as Exhibit 2 to the Obra Pia Complaint, the "draft" document is not presently before the Court.

The Addendum acknowledged that, in January 2014, KIT Capital had made a "partial redemption" to Seagrape in the amount of $50,000.  *See* Addendum at 2.  The parties acknowledged further, however, that "the amounts due under the Investment Agreement for both the Prior and New Amounts were not paid."  FAC ¶ 56 & Addendum at 3.  Accordingly, in light of the $50,000 partial redemption, the total "2013 Amount Due" was calculated as $4,331,492.  *See id.*  In addition, the parties agreed that a "reasonable preferred return"—at 10% per annum, compounded monthly (the "Delay Preferred Return")—would be applied to the 2013 Amount Due of $4,331,492, starting January 1, 2014.  *See* Addendum at 3; Addendum § 1.3.  Thus, the "New Amount Due" to Seagrape, including the Delay Preferred Return, was $4,656,354.  *See* FAC ¶ 56 & Addendum § 1.4.  The due date for payment of the New Amount Due (the "New Due Date") was identified as March 31, 2015.  *See* Addendum §§ 1.1 & FAC ¶ 56.

Pursuant to the Addendum, Seagrape also made an "additional capital investment" in OP Feeder in the amount of $343,646 (the "Additional Investment").  *See* Addendum § 2.1.  Seagrape contends that this sum was a loan that "would be used to pay the outstanding taxes and operational expenses of the Project."  FAC ¶ 57.  The Delay Preferred Return rate of 10% applied to the Additional Investment, but began to accrue only as of October 1, 2014.  *See* Addendum § 2.2 & FAC ¶ 57.

The parties further agreed that, including "both the New Amount Due and the Additional Investment," the "total amount due to Seagrape" was $5 million, "plus the Delay Preferred Return."  FAC ¶ 58 & Addendum § 2.5.  The "Current Amount Due," however, was identified as $4 million.  *See* Addendum § 2.5.  Specifically, "[i]n exchange for a reduction of the balance" from $5 million to $4 million, OP Feeder "agreed to issue Seagrape 500 limited partnership interests in OP Feeder," 100 of which were defined as "Ongoing Investment Interests" and the remaining 400 of which "would be returned upon redemption by OP Feeder of the Current Amount Due."  FAC ¶ 59; *see also* Addendum §§ 2.3, 2.5.  Seagrape alleges that, consistent with the Addendum and "in reliance upon Tuzman's

good faith," Seagrape also executed a "Limited Partnership Agreement of OP Feeder" on November 28, 2014.  FAC ¶ 59.[5]

### G.  The DTZ Memorandum

Seagrape asserts that, even after the Hybrid Round, the OP Defendants still "required substantial bank financing to complete construction of the Project," and thus, in approximately 2015, Tuzman retained the firm "Cassidy Turley Commercial Real Estate Services, Inc. d/b/a DTZ" ("DTZ") in order to "raise potential bank or other financing."  *Id.* ¶ 63.

In approximately June 2015, Tuzman and Blaurock allegedly provided Seagrape with "an offering memorandum prepared by DTZ on behalf of [KIT Nevis]," known as the "DTZ Memorandum," seeking additional financing for the Project in the amount of $23,561,213.  *Id.* ¶ 64. Seagrape alleges that—based on representations from Tuzman, Davi, and Blaurock—the DTZ Memorandum represented that KIT Nevis had begun construction on the Project in November 2014, and that it had "'already invested $27.8 million in equity to date, including $22.5 million in 'pre-development' land acquisition costs, $2,971,000 in construction costs[,] and $2,522,000 in indirect development costs."  *Id.* ¶ 65 (internal quotation marks omitted).  Seagrape maintains, however, that it subsequently learned that "these representations were false" because KIT Nevis "had not invested anything close to $27.8 million in equity, or $22.5 million in pre-development land acquisition costs." *Id.* ¶ 66.  Seagrape asserts further that these numbers were "designed to, and did, give comfort to existing and potential investors that the equity holders had substantial skin in the game—and thus had a strong incentive to complete the Project in order to obtain a return on their tens of millions of capital invested."  *Id.*

---

[5] The OP Feeder Limited Partnership Agreement has not been submitted with any of the motion papers in this action.

### H.  Tuzman's Indictment

In September 2015, Tuzman was indicted in the Southern District of New York for federal securities and accounting fraud in connection with KIT Digital, a business unrelated to this dispute. *See id.* ¶¶ 2, 68.  Seagrape alleges, however, that "the viability of the Project was severely impacted" by Tuzman's indictment and ultimate conviction.  *See id.* ¶ 2.  Seagrape asserts further that, for several years thereafter, Mullen "allowed Tuzman an opportunity to sell or complete the Project, and to pay back his investors, including Seagrape."  *Id.* ¶ 3.

On September 7, 2015, Tuzman allegedly emailed Mullen, requesting that he loan him an additional $400,000 as a "backstop" to "cover payroll and other expenses," i.e., "to protect the Project."  *Id.* ¶ 70.  Seagrape contends that, at that point, Tuzman failed to disclose that he had recently been indicted.  *See id.*  According to the Complaint, Mullen "dutifully wired" the money to Davi, KIT Nevis's CFO.  *See id.*  A few weeks later, Seagrape alleges, Tuzman requested that Mullen loan KIT Nevis an additional $41,000, which Mullen also did.  *See id.*  Seagrape asserts that, "when Tuzman asked Mullen for [this] $441,000 as a 'backstop' for [KIT Nevis] upon his arrest, it was not to keep the Project on track," but rather, "to cover [KIT Nevis's] enormous American Express Black Card bill" for certain "personal luxury items."  *Id.* ¶ 82.

Tuzman was ultimately found guilty of the charges of conspiracy to commit securities fraud and conspiracy to commit wire fraud on which he was indicted.  *See id.* ¶ 71.  Seagrape alleges that Tuzman's indictment "impacted the viability of the Project[] and placed Seagrape's loans and investments at risk."  *Id.* ¶ 72.

### I.  Attempts to Sell the Project

According to Seagrape, as a result of certain "difficulties" that stemmed from Tuzman's indictment, Tuzman "agreed to seek out a third-party that would purchase the Project in its unfinished state," which would allow Seagrape and other investors to receive a return on their "troubled

investments." *Id.* Mullen also apparently "agreed to help identify such a suitable purchaser or investor." *Id.*

On November 19, 2015, Blaurock, who was "acting President of [KIT Nevis]" at the time, circulated an "outreach" email to Mullen, which represented that $19 million in cash had been spent since 2010. *Id.* ¶ 73. On December 16, 2015, Davi sent an email to investors, including Mullen, which again asserted that KIT Nevis "had spent $19 million in 'hard cash' on the Project since 2010." *Id.* ¶ 74. And on December 21, 2015, Tuzman sent an email, on which Mullen was copied, "reiterat[ing] his claim that $19 million in 'hard cash' had been spent on the Project." *Id.* At some point thereafter, Tuzman, Davi, and Blaurock "began to receive offers to purchase the Project, including a non-binding offer valuing the Project at $27 million"—an amount which, Seagrape contends, would have been sufficient to "result in a full return to Seagrape, the senior secured creditor" at the time. *Id.* ¶ 75.

Seagrape asserts that, on December 29, 2015, KIT Nevis's counsel sent Mullen an email, confirming that Seagrape was "owed in excess of $7 million," plus "interest [that was] continuing to accrue on the amounts owed to Seagrape." *Id.* ¶ 76. KIT Nevis's counsel also allegedly confirmed that the "Obra Parties" were "currently engaged in a sale process/capital raise" such that "Seagrape [would] be paid off in whole or in part at the closing of the transaction." *See id.* According to Seagrape, in early 2016, Tuzman, Davi, and Blaurock also informed it that KIT Nevis had "received a number of offers for the Project in the $20 million range," but that they were "not interested in these offers" and thus did not pursue them because, Seagrape maintains, "they would not result in any substantial payment to [Tuzman, Davi, Blaurock] and [KIT Nevis] as the residual equity owners." *Id.* ¶ 79.

Additionally, during this time, Mullen allegedly informed Tuzman and his colleagues about certain defaults and non-payments. On January 15, 2016, for instance, Mullen informed Blaurock

and Davi, among others, that Obra Pia was "currently in default" because it had "failed to make several payments to Seagrape that became due throughout the past year, going back as far as March 2015." *See id.* ¶ 77.  Mullen also apparently explained that Seagrape had "held off on foreclosing on the entire project up until this point," based on certain representations made by Tuzman and "the entities he represents" that the present "funding round will ensure Seagrape is paid in full." *Id.*  On January 17, 2016, Mullen also allegedly emailed Tuzman directly, asking him to acknowledge that he was in default and to confirm that Mullen and Seagrape were owed at least $5 million based on the money they had provided to Tuzman over the years. *See id.* ¶ 78.

Ultimately, in 2016, GACP Latin American Partners LLC ("GACP") entered into a "non-binding letter of intent to purchase the Project." *Id.* ¶ 3.  Specifically, GACP entered into this Letter of Intent ("LOI") on August 23, 2016, agreeing to an "upfront purchase of shares and a commitment to fund the completion of the [D]evelopment." *Id.* ¶ 83.  Seagrape asserts that GACP did so "based upon an alleged valuation of the Project as completed at $50.2 million." *Id.*

### J.  Credit and Security Acknowledgement

Seagrape alleges that, in "connection with entering into the LOI with GACP," it also entered into a Credit and Security Acknowledgement (the "CSA") on August 25, 2016. *Id.* ¶ 84; *see also id.* ¶ 3 (alleging that it entered into the CSA in order to "facilitate a potential purchase" of the Project by GACP).  Seagrape entered into the CSA with Tuzman, Obra Pia, OP Colombia, OP Manager, and KIT Nevis.  *See* OP FAC Ex. 3 ("CSA").  Seagrape asserts that it entered into the CSA "as lender," FAC ¶ 85, although the CSA does not expressly define Seagrape's role.  *See* CSA at 1.  Tuzman, Obra Pia, OP Colombia, OP Manager, and KIT Nevis, however, were collectively identified as the "Debtors." *See* CSA at 1 & FAC ¶ 85.  The CSA specifically provided that the Addendum, executed on September

14

19, 2014, and the Investment Agreement, executed on April 30, 2013,[6] were "ratified and confirmed in their entirety, except as superseded or modified by [the CSA]." CSA § 4. The CSA referred to the Investment Agreement and the Addendum together as the "Previous Agreements." *Id.* The CSA provided, moreover, that "any contradiction between the Previous Agreements, on the one hand, and [the CSA], on the other, shall be resolved in favor of [the CSA]." CSA § 9.

Seagrape asserts that the "principal purpose" of the CSA was to "induce Seagrape to forbear from foreclosing upon the Project for a limited time" and to "enable GACP to execute the contemplated purchase of the Project." FAC ¶ 84. The CSA provided that Seagrape was "owed by the Debtors related to funds lent and invested, and penalties and interest levied, by Seagrape and related parties over time . . . in the [Project]." CSA § 1. The parties acknowledged in the CSA that the Debtors had "not repaid all of the funds lent by Seagrape when due" pursuant to the Previous Agreements. *See* CSA § 2. The CSA thus provided that, as of July 31, 2016, Seagrape was due $4,694,806 (the "Cash Amount Due"), which was to accrue interest from August 1, 2016 at the rate of 15% per annum "or the maximum rate allowed by applicable law." *See* CSA § 2 & FAC ¶ 86.[7] In entering into the CSA, Seagrape agreed, among other things, to "forbear from 'foreclosing' against the assets of the Project"—i.e., on its "mature claim to a 'Cash Amount Due' of $4,694,806"—until after March 31, 2017 (the "Foreclosure Date").[8] *See* FAC ¶ 3.

In the CSA, Seagrape agreed "not to foreclose" on the "Secured Assets"—defined as the "real-estate security for the Cash Amount Due," which consisted of "the Personal Guarantee" defined in

---

[6] Although the CSA states that the Investment Agreement was "executed between a number of the Parties on April 30, 2013," *see* CSA § 4, the "Execution Date" of the Investment Agreement is May 1, 2013, *see* Investment Agreement at 1.

[7] Although the Complaint states that Seagrape was due this amount as of July 1, 2016, the Court assumes that Seagrape intended to write July *31*, 2016, as provided in CSA § 2.

[8] While the initial Foreclosure Date was January 2, 2017, *see* CSA § 10, the parties agreed that, in the event that either Debtors or "a third-party on behalf of Debtors" paid Seagrape at least $1 million by January 2, 2017, the Foreclosure Date would be "extended to March 31, 2017," *see* CSA § 11. Seagrape contends that "[n]o further extension or forbearance was provided or agreed." FAC ¶ 88.

Investment Agreement § 5.6 "for the Guaranteed Balance" and the properties defined as "New Collateral" in the Addendum, *see* CSA § 5—or on "any other collateral" until the Foreclosure Date had passed, "as long as all Debtors completely fulfill their obligations under [the CSA]."  CSA § 11. The other parties—Tuzman, Obra Pia, OP Colombia, OP Manager, and KIT Nevis—in turn, agreed to "fully cooperate to facilitate Seagrape's foreclosing on the property" and to "not block such foreclosure or cooperate with anyone seeking to block it."  CSA § 11 & FAC ¶¶ 3, 89.

The CSA provided further that Seagrape was "entitled to a total of 237.5 LP Interests" in OP Feeder, "as a result of its original investment and certain Penalty LP Interests."  *See* CSA § 2 & FAC ¶ 86.  According to the CSA, Seagrape's 237.5 "beneficially-owned LP Interests" had a "conversion rate," as of July 31, 2016, of $2,882,018.  *See id.*  Seagrape maintains that it relied on the OP Defendants' "prior misrepresentations and omissions concerning the Project, including that there was $19 million in 'hard cash' invested into the Project" and that "Tuzman himself had invested over $10 million," when agreeing to "accept the additional 137.5 LP Units in OP Feeder."  FAC ¶ 87.

Additionally, the CSA provided that, in general, "any modification to the property rights of any of the Debtors on the Secured Assets, including any sale, mortgage, encumbrance, lien, or establishment of trust agreements in favor of any party, including equity holders, other than Seagrape, among others, must be first authorized in writing by Seagrape unless at the closing of such transaction or transactions the Cash Amount Due is immediately paid to Seagrape in full."  CSA § 6 & FAC ¶ 118.

The CSA contains a New York choice-of-law provision, providing that it "shall be governed by the laws of the State of New York . . . without regard to its rules of conflicts of law."  CSA § 12.

### K.  Subordination Agreement

According to the Complaint, GACP agreed to provide Obra Pia with a $1.5 million "bridge loan" (the "Senior Loan") in October 2016.  FAC ¶ 91.  The $1.5 million Senior Loan was divided

16

into a $1 million payment to Seagrape and a $500,000 payment going towards "expenses of the Project." *See id.* Seagrape alleges that, in order to "enable GACP to make the Senior Loan," it entered into a Subordination Agreement with GACP, OP Feeder, Obra Pia (Non-U.S.) Feeder, KIT Capital, and Obra Pia on October 14, 2016 (the "Subordination Agreement"). *See id.* ¶ 92 & OP FAC Ex. 4 ("Subordination Agreement"). As the "holder[] of the Senior Loan," GACP was identified as the "Senior Lender." Subordination Agreement at 1. Seagrape, OP Feeder, Obra Pia (Non-U.S.) Feeder, and KIT Capital were each identified as a "Subordinated Lender," and Obra Pia was identified as the "Borrower." *Id.*

Seagrape asserts that it entered into the Subordination Agreement directly with GACP in order to "enable GACP to lend funds for a partial payment to Seagrape." FAC ¶ 3. In particular, the parties expressly agreed that "all debt owed by [Obra Pia] to any of the Subordinated Lenders"—i.e., Seagrape, OP Feeder, Obra Pia (Non-U.S.) Feeder, and KIT Capital—"is and shall be subordinate and junior in right of payment to the prior payment in full of the Senior Loan and the obligations under the Senior Loan Documents, . . . and that the subordination is for the benefit and enforceable by [GACP]." Subordination Agreement § 1(a) & FAC ¶ 92. Seagrape thus "agreed to subordinate its claim for the Cash Amount Due to the Senior Loan." FAC ¶ 92.

The Subordination Agreement confirmed the Foreclosure Date of March 31, 2017. *See* Subordination Agreement § 1(b) & FAC ¶ 93. The Subordinated Lenders, including Seagrape, agreed further that they would not "declare a default with respect to any Subordinated Loan or exercise any rights with respect to any collateral securing the Subordinated Loans without providing [GACP] at least three [] months advanced notice." Subordination Agreement § 1(a); *see also* FAC ¶ 3 (alleging that, in entering into the Subordination Agreement, Seagrape "promised GACP that [it] would 'provide [GACP] at least three [] months advance notice' before 'declar[ing] a default with respect to any Subordinated Loan or exercis[ing] any rights with respect to the collateral securing the

Subordination Loans"). Other than the "March 31, 2017 date" and the "notice requirement," Seagrape contends, "the Subordination Agreement [did] not limit Seagrape's rights as a creditor under the CSA, Addendum[,] and Investment Agreement." FAC ¶ 94.

The Subordination Agreement contains a New York choice-of-law provision, providing that the Agreement, "and all disputes or controversies arising out of or relating to [the Subordination Agreement] or the transactions contemplated hereby[,] shall be governed by, and construed in accordance with, the laws of the State of New York." Subordination Agreement § 12.

### L. Failure to Close GACP Transaction and Seagrape's Notice of Default

After execution of the Subordination Agreement, GACP made the Senior Loan and thereby "funded the payment of [$1 million] to Seagrape, which extended the Foreclosure Date to March 31, 2017." FAC ¶ 96. Nonetheless, Seagrape maintains that "upon further diligence," GACP "substantially reduced the amount of its original offer" from $50.2 million to $43.9 million. *Id.* ¶ 97. This was done through an "Amendment to the LOI, dated December 5, 2016." *See id.* In that Amendment, GACP also apparently agreed "to purchase shares for $20.85 million" and "to fund no more than $18.7 million to complete the Project." *Id.* Seagrape alleges, however, that Tuzman ultimately "failed to close a transaction with GACP by March 31, 2017." *Id.* ¶ 98. Indeed, Tuzman allegedly "held out for terms unacceptable to GACP" in order to "conceal the OP Defendants' previous fraud and inflated valuation of the Project," and "in the hope of achieving a return on his equity at the expense of his creditors." *Id.* ¶ 5.

On April 27, 2017, Seagrape thus "gave GACP written notice of Seagrape's intent to declare a default and to enforce all of its rights, including against the assets of the Project." *Id.* Specifically, Seagrape allegedly sent GACP a letter on this date (the "Senior Lender Notice"), providing "formal

written notice to GACP of its intent to declare a default under the Loan Agreements, and to proceed in enforcing all of its rights, including against the Secured Assets."[9]  *See id.* ¶ 98.

According to the Complaint, Tuzman "continued negotiating with GACP" even after Seagrape sent the Senior Lender Notice.[10]  *Id.* ¶ 99.  GACP, however, subsequently "further reduced its valuation of the Project to less than $30 million."  *Id.*  Seagrape alleges that Tuzman then "began colluding with GACP to induce Seagrape to accept less than a full recovery[] so that [KIT Nevis] could receive a recovery on its residual equity."  *Id.*  Seagrape asserts further that Tuzman "proposed a secret side-deal" to GACP in order to "dupe creditors, including Seagrape, to accept a substantial haircut in order to fund a return for Tuzman's entity, [KIT Nevis], as an equity holder," as well as a "discount to GACP."  *Id.* ¶ 102.  For instance, in a May 5, 2017 email, Tuzman, Davi, and Blaurock apparently informed "Hybrid Round investors, including Seagrape," that GACP and KIT Nevis had "conducted 'a detailed joint legal analysis' to determine the timeframe for effective foreclosure efforts by Seagrape."  *Id.* ¶ 100.  And in an October 22, 2017 email that was "obtained by Mullen," Tuzman allegedly "suggested to GACP that rather than insist upon a further reduction of the total price," GACP should instead continue to "offer the total of the previous LOI valuation," i.e. $27,824,000, "collaborate" with KIT Nevis "on getting creditors to receive less than face value," and "share[] a 50% benefit . . . on any savings realized from face value" with KIT Nevis, with the "other 50% just reduc[ing] the amount that [GACP] pay for the asset."  *Id.* ¶ 101.

**M. SDS Complaints**

On November 6, 2017, Seagrape filed a complaint with the Colombian *Superintendencia de Sociedades* (the "SDS"), requesting that the SDS investigate "irregularities" at Obra Pia's Colombian

---

[9] "Loan Agreements" is not a defined term in the Complaint.

[10] Seagrape references both the "Senior Lender Notice" and the "Senior Notice Letter" in the Complaint.  As "Senior Notice Letter" is not a defined term, the Court assumes that both terms refer to the April 27, 2017 "Senior Lender Notice," as defined in paragraph 98.

subsidiary, OP Colombia.  *See id.* ¶¶ 6, 103.  According to Seagrape, the SDS then found "a number of irregularities in the accounting and management" of OP Colombia, including that OP Colombia "failed to record [certain] debts on its books," and that there were "discrepancies between sworn certifications concerning the value of the properties acquired for the Project[] and the value ascribed to those properties in the company's financial statements."  *Id.* ¶ 104.  Pursuant to an order dated January 18, 2018, the SDS allegedly required OP Colombia to submit an "improvement plan" to address four specific "irregularities and deficiencies."  *Id.* ¶ 105.

Seagrape maintains that the SDS issued a "written Resolution," dated August 20, 2019, which "concurred with Seagrape that [Obra Pia's] subsidiary was in 'critical' financial and administrative condition."  *Id.* ¶ 6.  As a result, Seagrape alleges, the SDS placed OP Colombia "under its supervision" and required it to "implement substantial reforms."  *See id.*; *see also id.* ¶ 104 (alleging that the SDS "indicat[ed]" that there was a "critical situation of accounting" and thus "mandate[ed] that the company be supervised by the SDS").  The SDS also apparently noted that, as a result of the "critical situation," progress on the Project had been "suspended" as of September 2017, and "there had been a 'stoppage of payments.'"  *Id.* ¶ 104.

### N.  BVI Statutory Demand and Subsequent Proceedings

On January 21, 2019, Seagrape served Obra Pia with a Statutory Demand under the BVI Insolvency Act 2003, seeking "repayment of Seagrape's Cash Amount Due," which Seagrape asserts totaled over $5 million—specifically, $5,099,917.49—at the time.  *See id.* ¶¶ 7, 106.  According to Seagrape, "if payment is not made within 21 days of such a demand," then—pursuant to BVI law— "the debtor may be placed into liquidation."  *Id.* ¶ 106.

Obra Pia subsequently brought a legal proceeding against Seagrape in the BVI Court (the "BVI Proceeding"), seeking to "set aside the [Statutory] Demand" on grounds that Obra Pia "had off-setting counterclaims against Seagrape arising under New York law."  *Id.* ¶ 107.  In particular,

Seagrape alleges that Obra Pia's attorney, Defendant Garland, filed an opposition, "based upon a factually false and misleading legal opinion," asserting that Obra Pia had such "off-setting counterclaims." *Id.* ¶ 7.  Obra Pia's local counsel also "made a sworn representation to the BVI Court," which Seagrape asserts was "demonstrably false" because it had represented that Seagrape "had not served the Senior Lender Notice at least three months before proceeding to enforce its rights with the Statutory Demand," as was required by the Subordination Agreement. *Id.* ¶ 107.

In addition, Seagrape contends that, in support of its application in BVI Court, Obra Pia's local attorneys "submitted false and misleading affidavits from Tuzman and from Garland." *Id.* ¶ 109.  For instance, Tuzman submitted an affidavit in which he allegedly "falsely represented to the BVI Court that Seagrape 'served a statutory demand on [Obra Pia] on January 21, 2019 without giving any advance notice.'" *Id.*  Seagrape alleges that Garland also submitted an affidavit, dated February 15, 2019, in which he similarly "misleadingly stated to the court that '[a]ccording to Mr. Tuzman, Seagrape did not give the required notice and thus it did not have, and does not have, the right to seek payment because the opportunity to cure any default has not begun.'" *Id.* ¶¶ 108-09.  According to Seagrape, Garland also "falsely represented" that by "failing to provide the requisite notice, Seagrape breached its obligations to the Obra Entities" under the Subordination Agreement. *Id.* ¶ 109.  Garland further "falsely represented" to the BVI Court that "the SDS complaints were improper" and that the "SDS inquiry/investigation did not turn up any malfeasance," statements which—Seagrape maintains—are contradicted by the SDS Resolution, "which makes clear that the SDS inquiry found substantial malfeasance by [the OP Defendants] and ordered substantial remedial measures." *Id.* ¶ 110.  Seagrape avers that, based on such "objectively false statements of fact," Garland asserted in his affidavit that, "rather than being liable to Seagrape under the CSA," Obra Pia actually had "meritorious off-setting counterclaims against Seagrape" for claims such as breach of contract and breach of the implied duty of good faith and fair dealing. *Id.* ¶ 111.

21

Seagrape contends that the BVI Court was "[c]onfused by the objectively false statements of fact" in the affidavits filed by Tuzman and Garland, which were "misleadingly proffered" by Obra Pia's local attorneys, *id.* ¶ 112, as well as "[u]ncertain of the merits of [the] claims under New York law," *id.* ¶ 7. As such, the BVI Court concluded that Obra Pia's claims "potentially might have merit," as there were "'triable issues' concerning whether the SDS complaint was premature, and thus a breach of the Subordination Agreement." *Id.* ¶ 112. It therefore "abstain[ed] from attempting to adjudicate" Obra Pia's claims, and instead "conditionally set aside the Statutory Demand." *Id.* ¶ 113. The BVI Court apparently only did so, however, on the condition that Obra Pia must "commence[] action on its claims in New York within thirty days." *Id.* If Obra Pia "failed to do so, or failed to diligently pursue its alleged claims in New York," then Obra Pia's debt to Seagrape would be "payable immediately." *Id.*

Seagrape alleges that, following the issuance of the BVI Court's judgment, the OP Defendants "elected to commence a frivolous lawsuit in New York," instead of paying their obligations to Seagrape, which they purportedly did "solely for the purpose of delay" and "to tarnish Mullen's good name and business reputation." *See id.* ¶¶ 8, 114. In the New York lawsuit—initially brought in state court and then removed to this Court in the Obra Pia Action—the OP Defendants and their counsel, Defendants Garland and Elan, allegedly "asserted the same factually false claims" from the BVI Proceeding, in "an attempt to defraud the [New York] court." *Id.* ¶ 8. In particular, Garland and Elan allegedly "ignor[ed] the [Senior Lender Notice]" and "falsely contended that the SDS Complaints and Statutory Demand were premature—and thus in breach of the Subordination Agreement—because '[u]pon information and belief, Seagrape failed to provide the notice it was required to give pursuant to the Subordination Agreement before" such filings. *See id.* ¶ 115. Seagrape also contends that the OP Defendants wrongfully claimed that "they were entitled to an award of $20 million" and

"frivolously named" Mullen as a defendant—"solely to drag [Mullen] through the mud and damage his good business reputation." *Id.* ¶ 8.

According to Seagrape, Defendants Garland and Elan withdrew as counsel after receiving "a Rule 11 safe harbor warning letter," and the "fraudulent complaint" was subsequently "withdrawn and replaced." *Id.* ¶ 8; *see also id.* ¶ 116. The OP Defendants' "new counsel" then filed a "First Amended Complaint," which does not "dispute" the Senior Lender Notice, and which "asserts entirely new and different claims." *Id.* ¶ 116.

### O. Alleged Restructuring of the Project

Seagrape asserts that, on October 11, 2019—after the Obra Pia Action was filed—the OP Defendants' counsel informed it that "there had been a 'restructuring' of the Project, which involved an injection of new capital." *Id.* ¶ 119. Seagrape maintains further that Tuzman confirmed this "new capital" in a text message to Mullen later that day. *See id.* Seagrape contends that, because the "alleged restructuring was not done upon prior notice and authorization of Seagrape and did not involve a complete payoff of the Cash Amount Due to Seagrape," the "alleged restructuring" was in breach of § 6 of the CSA. *See id.* ¶¶ 120-21.

### II.   Procedural Background

Seagrape filed this action on October 22, 2019, Dkt. 1, and this Court accepted it as related to the Obra Pia Action on November 4, 2019. On January 10, 2020, Seagrape filed the First Amended Complaint—the operative complaint in this case. Dkt. 35. The OP Defendants filed a motion to dismiss on January 24, 2020, Dkt. 42, which Seagrape opposed on February 14, 2020, Dkt. 51. The OP Defendants did not file a reply brief.[11] Defendant Garland also filed a motion to dismiss on

---

[11] On July 8, 2020, the Court ordered the OP Defendants to file their reply brief—which had been due by March 10, 2020 —no later than July 13, 2020. *See* Dkt. 68. To date, however, the OP Defendants have failed to file a reply brief or a letter indicating that they did not intend to file any such reply.

January 24, 2020.  Dkt. 39.  Seagrape filed its opposition on February 14, 2020, Dkt. 53, and Garland filed his reply on March 3, 2020, Dkt. 59.  Finally, Defendant Elan filed a motion to dismiss on February 7, 2020, Dkt. 48, to which Seagrape filed an opposition on February 28, 2020, Dkt. 57, and Elan filed a reply on March 13, 2020, Dkt. 62.  On August 27, 2020, the Court received supplemental letter briefs from the parties regarding whether the law of New York or the law of the British Virgin Islands applies to the claims in this case.  *See* Dkt. 72 (Seagrape Supp. Ltr.); Dkt. 75 (OPD Supp. Ltr.); Dkt. 71 (Garland Supp. Ltr.); Dkt. 73 (Elan Supp. Ltr.).

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether [the] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (citation omitted).  In answering this question, the Court must "accept[] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).  Moreover, on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns*, 493 F.3d at 98.

24

**DISCUSSION**

**I.      The OP Defendants' Motion to Dismiss**

**A.  Securities Fraud Under Section 10(b) and Rule 10b-5**

Seagrape first asserts a cause of action—against Tuzman, KIT Capital, Obra Pia, and OP Feeder—for securities fraud violations under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  Seagrape brings this claim in connection with the "purchase and sale of 100 LP Units in OP Feeder in the Addendum, between August and November 28, 2014," as well as the "purchase of 137.5 LP Units in OP Feeder in the CSA, on August 25, 2016."  *See* FAC ¶ 124.  It alleges that, in order to "induce [Seagrape's] purchase of [a total of] 237.5 LP Units in OP Feeder," Tuzman, KIT Capital, Obra Pia, and OP Feeder made various materially false and misleading representations to Seagrape.  *See id.* ¶ 125.

As an initial matter, the OP Defendants argue that Seagrape's securities fraud claim is barred by the applicable statutes of limitations and repose.  *See* OPD Mot. at 11-14.  "Private actions under Section 10(b) of the Exchange Act are subject to a two-year statute of limitations and a five-year statute of repose."  *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 299 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173 (2d Cir. 2016).  Specifically, "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws," defined to include the Exchange Act, "may be brought not later than the earlier of (1) 2 years after the discovery of facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b); *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 104 (2d Cir. 2004) (interpreting the five-year limit in § 1658(b)(2) as a "statute of repose").  A district court may consider timeliness on a motion to dismiss when the circumstances are "sufficiently clear on the face of the complaint and related documents as to make the time-bar ruling appropriate on a motion to dismiss."

*Wiedis v. Dreambuilder Invs., LLC*, 268 F. Supp. 3d 457, 465 (S.D.N.Y. 2017) (quoting *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 543 (S.D.N.Y. 2013)).

Statutes of limitations and statutes of repose differ in significant ways. Statutes of limitations, on the one hand, "are designed to encourage plaintiffs to pursue diligent prosecution of known claims. In accord with that objective, limitations periods begin to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (internal quotation marks and citation omitted); *see also Bongiovanni v. NASDAQ Stock Mkt. LLC*, No. 17-CV-7570 (CM), 2017 WL 8777379, at *3 (S.D.N.Y. Dec. 6, 2017) ("Section 1658(b)(1) is a statute of limitations, . . . [that] does not 'begin to run until the plaintiff discovers—or a reasonably diligent plaintiff would have discovered—the facts [showing the defendant's] mental state embracing [the] intent to deceive, manipulate, or defraud.'") (quoting *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011)). Statutes of repose, on the other hand, "effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time. For this reason, statutes of repose begin to run on the date of the last culpable act or omission of the defendant." *ANZ Sec.*, 137 S. Ct. at 2049 (internal quotation marks and citation omitted); *see also Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) ("[T]he time limit for a statute of limitations is measured from the time the plaintiff discovers or should have discovered the injury, whereas the time limit for a claim subject to a statute of repose is measured from the last culpable act of the defendant (meaning that the plaintiff's discovery of the injury is irrelevant for a statute of repose).").

Thus, the five-year statute of repose under Section 1658 is "a fixed statutory cutoff, which is independent of a plaintiff's awareness of the violation [under Section 10(b)] and is not subject to equitable tolling." *Arco Cap.*, 949 F. Supp. 2d at 543; *see also Bongiovanni*, 2017 WL 8777379, at *3 ("Section 1658(b)(2), however, is a statute of repose, . . . which is 'an absolute bar on a defendant's

temporal liability,'" and "is neither dependent on discovery nor subject to equitable tolling.") (citations omitted). Indeed, "a statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action." *P Stolz Family P'ship*, 355 F.3d at 102-03; *see also Dekalb Cty. Pension Fund v. Transocean Ltd.*, 36 F. Supp. 3d 279, 285 (S.D.N.Y. 2014), *aff'd*, 817 F.3d 393 (2d Cir. 2016), as amended (Apr. 29, 2016) ("Although it may seem harsh for a statute of repose to bar a claim shortly before, or even after the plaintiff discovers the claim, in contrast to statutes of limitations, 'a statute of repose may bar a claim *even before the plaintiff suffers injury*, leaving her without any remedy.'") (quoting *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013)) (emphasis in original).

In the context of federal securities claims in particular, the statute of repose begins to run "on the date the parties have committed themselves to complete the purchase or sale transaction." *Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009) (citation omitted). In other words, the statute begins to run on the date of the alleged violation. *See Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014); *see also Arnold*, 334 F. App'x at 351 (rejecting the argument that "the period of repose begins to run at the time of the last alleged misrepresentation (even when made after the final purchase or sale of the securities)," explaining that such an argument "ignores the applicable limitations period, and thus, is devoid of merit"). A violation under Section 10(b) and Rule 10b-5, moreover, "occurs at each transaction for the purpose of calculating the repose date. Thus, any claim under Section 10(b) and Rule 10b-5 relating to a sale or purchase of securities that occurred outside the five-year statute of repose is time-barred." *Kaplan*, 40 F. Supp. 3d at 343.

As noted, Seagrape brings its Section 10(b) claim in connection with its purchase of a total of 237.5 LP Units in OP Feeder. Pursuant to the Addendum, OP Feeder issued to Seagrape 500 LP Units in OP Feeder "immediately upon the execution of this Addendum," which represented a $5

million ownership interest in OP Feeder.  *See* Addendum § 2.3.  One hundred of the 500 LP Units, for a value of approximately $1 million, were designated as "Ongoing Investment Interests."  *See id.* Seagrape acknowledges that its securities fraud claim is based, at least in part, on its "purchase [of] 100 LP Units in OP Feeder in the Hybrid Round" for $1 million, and its agreement to "accept the pledge of 400 additional LP Units as security for the Addendum."  Opp'n to OPD Mot. at 13. Although Seagrape asserts that these transactions occurred on November 27, 2014—when Mullen, on behalf of Seagrape "executed the final version of the Addendum, as well as the Hybrid Round Subscription Agreement," *see* FAC ¶ 52; Opp'n to OPD Mot. at 13—the Addendum plainly reflects a transaction that occurred on September 19, 2014, not November 27, 2014.  Indeed, the Addendum's "Effective Date" is clearly identified as September 19, 2014.  *See* Addendum at 1.  There is no indication in the text of the Addendum that it did not go into effect, or was not fully executed, until November 27, 2014. *See Roberts v. Bliss*, 229 F. Supp. 3d 240, 248 (S.D.N.Y. 2017) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true.") (citation omitted). As the transaction involving the "purchase and sale of 100 LP Units in OP Feeder" occurred more than five years prior to the filing of the initial complaint, which occurred on October 22, 2019, Seagrape's securities fraud claim under Section 10(b)—to the extent it relies on any alleged misstatements that induced it to purchase the 100 LP Units or otherwise enter into the Addendum— is time-barred under the statute of repose.  *See SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173, 177 (2d Cir. 2016).

Whether Seagrape's 10(b) claim—to the extent it is based on its receipt of an additional 137.5 LP Units through the CSA—is timely is a closer question.  First, as to the CSA, Seagrape contends that it purchased "a further 137.5 LP Units in connection with the CSA," and that this transaction therefore occurred "as part of the CSA" on August 25, 2016.  *See* Opp'n to OPD Mot. at 13.  The

applicable section of the CSA states only that "[p]ursuant to the Previous Agreements"—defined as the May 2013 Investment Agreement and the September 2014 Addendum together—Seagrape was "entitled to a total of 237.5 LP Interests" in OP Feeder "as a result of its original investment and certain Penalty LP Interests." *See* CSA § 2. Section 2 provided further that, because Seagrape held 526.5 LP Interests in OP Feeder at that time, which constituted "many more LP Interests than it [was] due," Seagrape was required to "take all and necessary steps to surrender 325 of these LP Interests" within 3 days after it was "repaid the entirety of the Cash Amount Due." *See id.* In the CSA, the parties acknowledged that Seagrape's "237.5 beneficially-owned LP Interests" had a "conversion value of [] $2,882,018 as of July 31, 2016," *see id.*, but it is not clear from the CSA itself that Seagrape actually purchased an additional 137.5 LP Units pursuant to it, and not pursuant to some other agreement. Nevertheless, construing all of Seagrape's allegations in its favor, as the Court must at this stage, any alleged misstatements made to induce Seagrape to purchase an additional 137.5 LP Units pursuant to the CSA are timely under the statute of repose, as they would have occurred as of August 26, 2015, when the CSA was executed.[12]

The Court next turns to the merits of Seagrape's Section 10(b) claim. Seagrape alleges that it "relied upon the OP Defendants' prior misrepresentations and omissions concerning the Project, including that there was $19 million in 'hard cash' invested into the Project" and that "Tuzman himself had invested over $10 million," in "agreeing to accept the additional 137.5 LP Units in OP Feeder" pursuant to the CSA. *See* FAC ¶¶ 86-87. Specifically, the OP Defendants allegedly made the following misrepresentations: (1) on July 3, 2014, Defendants made "false representation[s] of fact"

---

[12] The Court rejects the OP Defendants' argument that Seagrape's securities fraud claim is barred by the statute of limitations because it "fail[ed] to bring a claim within two years after discovery of the facts constituting the violation." OPD Mot. at 12. As noted above, "the time limit for a statute of limitations is measured from the time the plaintiff discovers or should have discovered the injury." *Pasternack*, 863 F.3d at 175. It is not clear from the Complaint, however, that Seagrape should have discovered the OP Defendants' fraud prior to October 22, 2017.

that (a) "the Project was exceptionally profitable, and had nearly tripled in value since 2010," (b) "Tuzman had personally invested over $10 million to purchase all five parcels of real estate comprising the Project," (c) "Tuzman had obtained a $20 million [] bank loan to develop the Project," and (d) "Tuzman had obtained a $5 million equity investment from Mubadala"; (2) at some unspecified point, Defendants made the "false representation" that Seagrape's "investment of $1 million to acquire LP Units in OP Feeder would be used to develop the Project, rather than to fund personal expenses of Tuzman"; and (3) in the DTZ Memorandum, Defendants made "false representations of fact," based on certain representations by Tuzman, Davi, and Blaurock, that "[KIT Nevis] 'began construction of the project [] in November 2014 and [had] already invested $27.8 million in equity to date,' including $22.5 million in 'pre-development' land acquisition costs, $2,971,000 in construction costs[,] and $2,522,000 in indirect development costs." *Id.* ¶ 125. Seagrape contends that, if it had "known the truth," it "would not have purchased the LP Units or, at a minimum, [it] would not have purchased the LP Units at the price it paid." *Id.* ¶ 126.

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff 'must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Axar Master Fund, Ltd. v. Bedford*, 806 F. App'x 35, 37 (2d Cir. 2020) (quoting *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010)). In addition to the requisite Rule 12(b)(6) pleading standards, federal securities fraud claims are also subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting" the alleged fraud. Fed. R. Civ. P. 9(b). To do so successfully, "the plaintiff must '(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)); *see also id.* (explaining that the PSLRA expands on Rule 9(b) and requires "that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind") (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)) (internal quotation marks omitted).

Here, even assuming that the OP Defendants made false and material statements about the Project, and that Seagrape has pleaded the requisite scienter, Seagrape's securities fraud claim nonetheless fails because it has failed to adequately plead loss causation. "It is long settled that a securities-fraud plaintiff must prove both transaction and loss causation." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks and citation omitted). "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Id.* (internal quotation marks and citation omitted); *see also Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992) (defining loss causation as causation demonstrating "that the misrepresentations or omission caused the economic harm," and contrasting loss causation with transaction causation, which is defined as causation demonstrating "that the violations in question caused the plaintiff to engage in the transaction in question") (citation omitted). "In other words, plaintiffs must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Axar Master Fund*, 806 F. App'x at 38 (quoting *Lentell*, 396 F.3d at 173). The Second Circuit has made clear that "loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant." *Lentell*, 396 F.3d at 174. "If that relationship is sufficiently direct, loss

causation is established, . . . but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, . . . a fraud claim will not lie." *Id.* (internal quotation marks and citations omitted).

"A plaintiff can establish loss causation," for instance, "by showing that 'the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Axar Master Fund*, 806 F. App'x at 37-38 (quoting *ATSI Commc'ns*, 493 F.3d at 107); *see also Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (explaining that plaintiffs must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered"). But nonetheless, "[t]o establish loss causation a plaintiff must show[] that the economic harm that it suffered *occurred as a result of* the alleged misrepresentations." *Citibank*, 968 F.2d at 1495 (emphasis in original). Moreover, "[t]o prove loss causation, plaintiffs must distinguish the alleged fraud from the tangle of other factors that affect a stock's price." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008), *aff'd,* 597 F.3d 501 (2d Cir. 2010) (alterations, internal quotation marks, and citation omitted). The plaintiff has the burden of proving loss causation. *See Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 397 (S.D.N.Y. 2018), *aff'd,* 784 F. App'x 27 (2d Cir. 2019).

Seagrape fails to plausibly allege how the OP Defendants' fraudulent statements about the Project, its progress, and the money that had been invested in it "diminished the value of [their] investments and resulted in a loss." *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 367 (S.D.N.Y. 2013). The Complaint is devoid of allegations demonstrating that such purportedly false and misleading statements were "the cause of the actual loss suffered," *Suez Equity Inv'rs*, 250 F.3d at 95, or, in other words, that any "economic harm that [Seagrape] suffered *occurred as a result of* the alleged misrepresentations," *Citibank*, 968 F.2d at 1495. In particular, Seagrape fails to "distinguish the alleged fraud from the tangle of other factors" that may have affected any loss in its investment in the

Project, *In re Omnicom Grp.*, 541 F. Supp. 2d at 553, such as the filing of SDS Complaints and the subsequent SDS supervision. *See also, e.g.*, *Leykin*, 423 F. Supp. 2d at 246 ("The [complaint] does not allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the [] market-wide Internet stock collapse—nor any way to separate the effect of the misstatements (if there was any) from the general collapse or other causes.").

In its opposition, Seagrape merely argues—in conclusory fashion—that the OP Defendants' "fraud, self-dealing and mismanagement of the Project," as well as their "refusal to honor the CSA and sell the Project for the amounts offered by GACP and other bidders," is the "clear cause of Seagrape's loss." Opp'n to OPD Mot. at 19. Citing paragraphs 41-42, 65, 73-74, 82-84, and 125 of the Complaint, it also asserts that it has "amply alleged that the OP Defendants' fraud caused it to . . . enter into the CSA," among other things. *See id.* But the cited Complaint paragraphs do not lend Seagrape much support as to loss causation. Rather, they simply describe Defendants' alleged misstatements and omissions, *see* FAC ¶¶ 41-42, 65, 73-74, 82, and the basic details of how and when the relevant parties entered into the CSA, *see id.* ¶¶ 83-84. And, Seagrape's assertions that the OP Defendants caused it to suffer damage by inducing it to enter into the CSA and purchase 137.5 additional LP Units, *see, e.g.*, *id.* ¶¶ 86-87, "more obviously allege *transaction* causation, i.e. had [Seagrape] known of the fraud, [it] would not have continued to invest with [the OP Defendants]," not loss causation. *See Szulik*, 966 F. Supp. 2d at 367 (emphasis added).

Moreover, while loss causation is "[t]ypically . . . demonstrated through a corrective disclosure that reveals the falsity of previous information[,] . . . it may also be shown by the 'materialization of risk' method, whereby a concealed risk . . . comes to light in a series of revealing events that negatively affect stock price over time." *Gross*, 310 F. Supp. 3d at 398. Here, Seagrape has not plausibly alleged either scenario. It does not sufficiently allege that the OP Defendants made any particular "corrective disclosures," which revealed the falsity of their challenged statements, nor

that a series of "revealing events" led to a "materialization of the risk." *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) ("In order to plead corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which the available public information regarding the company's financial condition was corrected, . . . and that the market reacted negatively to the corrective disclosure.") (alterations, internal quotation marks, and citation omitted); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 475 (S.D.N.Y. 2014), *aff'd sub nom. Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015) ("In order to successfully plead loss causation under the materialization of risk method, the 'new information' revealed must have been previously concealed and fall within the 'zone of risk' concealed so that the events were foreseeable consequences of the fraud.") (internal quotation marks and citation omitted).

Because the Complaint fails to plausibly plead a connection between the risks concealed through Defendants' alleged misstatements, on the one hand, and Seagrape actual loss, on the other, Seagrape's securities fraud claim under Section 10(b) must be dismissed. *See GE Inv'rs v. Gen. Elec. Co.*, 447 F. App'x 229, 232 n.2 (2d Cir. 2011) (explaining that "plaintiffs' failure to plead loss causation is a sufficient basis on which to grant defendants' motion to dismiss" and it is "thus unnecessary to consider defendants' [other arguments]" as to this claim).

### B.  Common Law Fraud

Seagrape also brings a common law fraud claim based largely on the same allegedly "materially false representations" discussed above, which were made in connection with Seagrape's purchase of 100 LP Units in OP Feeder, as provided in the Addendum, and its purchase of 137.5 LP Units in OP Feeder, as provided in the CSA. *See* FAC ¶ 129.  Additionally, Seagrape asserts that, on September 7, 2015, Tuzman falsely represented that the $441,000 that Seagrape loaned was "to be used as a 'backstop' to cover payroll and other expenses, to protect the Project." *Id.* ¶ 130.  At that point, however, Tuzman allegedly failed to disclose that he had been indicted for federal securities

fraud, *see id.* ¶ 131, and that KIT Nevis "had incurred at least $379,000 in personal expenses for luxury items on its American Express Black Card, and that the principle [sic] purpose of the loan was, not to fund the Project, but to pay Tuzman's egregious personal expenses," *id.* ¶ 132.  As such, Tuzman allegedly induced Seagrape to loan KIT Nevis $400,000, and then an additional $41,000, based on these false representations.  *Id.* ¶ 130.

To state a claim for common law fraud under New York law, a plaintiff must allege: "(1) a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (citations omitted).  "The reliance requirement means that it is insufficient for a fraud plaintiff to show merely that some chain of events beginning with a false statement by defendants led to his injury."  *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 775 (S.D.N.Y. 2011) (citation omitted).  "To establish causation" with respect to a common law fraud claim, the plaintiff "must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)."  *Id.* at 776 (citation omitted).  Indeed, "[t]he elements of common law fraud are [] essentially the same as those required to state a claim under Section 10(b) and Rule 10b–5."  *Wiedis*, 268 F. Supp. 3d at 467 (citation omitted); *see also Amusement Indus.*, 786 F. Supp. 2d at 777 ("The loss causation requirement in a common law fraud claim is equivalent to the 'proximate' cause concept found in other tort cases and in the federal securities context.").  Thus, "claims of common law fraud, like federal securities claims, must satisfy the requirements of Rule 9(b)."  *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 96 F. Supp. 3d 325, 347 (S.D.N.Y. 2015), *aff'd,* 645 F. App'x 72 (2d Cir. 2016) (citation omitted).

Where a plaintiff brings both a Section 10(b) claim and a common law fraud claim, and the former is dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6)—including for failure to adequately plead loss causation—courts in this Circuit have dismissed the common law claim as well. *See, e.g.*, *Axar Master Fund*, 806 F. App'x at 38 n.2 (affirming the "district court's dismissal of plaintiffs' common law fraud claims after concluding that plaintiffs failed to state a claim for federal securities fraud" because "the elements of claims for federal securities fraud and New York common law fraud are nearly identical"); *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, No. 17-CV-1235 (GHW), 2019 WL 1436993, at *12 (S.D.N.Y. Mar. 30, 2019) ("Because . . . Plaintiffs fail to allege facts in the SAC to adequately plead loss causation with respect to their claims against [Defendant] under Section 10b and Rule 10b-5, the Court also dismisses Plaintiff's common-law fraud claims."); *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 293 (S.D.N.Y. 2011) ("Similar to the FAC's securities fraud claim, the common law fraud claim fails to establish causation and is therefore dismissed."). Here, for the same reasons discussed above, Seagrape fails to plausibly allege that the OP Defendants' alleged misstatements directly and proximately caused its loss. Its common law fraud claim is thus also dismissed.

### C. Breach of Contract

Seagrape next asserts a breach of contract claim against Tuzman, KIT Capital, KIT Nevis, Obra Pia, OP Manager, and OP Colombia. "To state a claim for breach of contract under New York law, a plaintiff must allege '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 F. App'x 109, 111 (2d Cir. 2013) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Seagrape contends that the OP Defendants breached the Investment Agreement, the Addendum, and the CSA by (1) failing to pay the amounts owed under the Agreements when due, *see* FAC ¶ 138; (2) "bringing the BVI Proceeding to block the enforcement

of [Seagrape's] rights as a creditor, in violation of their duty under § 11 of the CSA to 'fully cooperate to facilitate Seagrape's foreclosing on the property and [to] not block such foreclosure or cooperate with anyone seeking to block it,'" *id.* ¶ 141; and (3) "engaging in a 'restructuring,' including the injection of new capital, without the prior notice and consent of [Seagrape]," *id.* ¶ 142.

First, Seagrape maintains that pursuant to the Investment Agreement, the Addendum, and the CSA, it was due $4,694,806 (the "Cash Amount Due") as of July 31, 2016, with interest commencing August 1, 2016 at a rate of 15% per annum, although this amount was later reduced to $3,694,806 after the October 18, 2016 payment of $1 million.  *See* FAC ¶ 136.[13]  Ultimately, Seagrape contends, the Cash Amount Due as of August 1, 2019, including accrued interest, was $5,391,452.87.  *See id.* Through the Investment Agreement, Mullen (who was later replaced by Seagrape as the "Investor") initially invested a total of $3,735,513.  *See* Investment Agreement at 1.  The Investment Agreement provided for a redemption to Mullen on or before December 31, 2013.  *See* Investment Agreement § 3.1  The Addendum, which "incorporated [the Investment Agreement] by reference," *see* Addendum at 1, identified the total amount due to Seagrape at that time as $4,331,492, *see* Addendum at 3, and provided further that Seagrape would invest an additional $343,646, *see* Addendum § 2.1, and that Seagrape's investments were to be redeemed by March 31, 2015, *see* Addendum §§ 1.1, 1.2.  The "total redemption amount due" to Seagrape under the Addendum was thus $4 million (the "Current Amount Due"), which included the additional investment of $343,646, but excluded the $1 million worth of LP Units that Seagrape received.  *See* Addendum § 2.5.  Finally, pursuant to the CSA— which expressly provided that the Addendum and the Investment Agreement were "ratified and confirmed in their entirety, except as superseded or modified by [the CSA]," CSA § 4—the parties recognized that the Debtors had "not repaid all of the funds lent by Seagrape when due" pursuant to

---

[13] Again, while paragraph 136 of the Complaint states that Seagrape was due this amount as of July 1, 2016, the Court assumes that Seagrape intended to write July *31*, 2016, as provided in CSA § 2.

the Previous Agreements, and thus provided that, as of July 31, 2016, Seagrape was due $4,694,806 (the "Cash Amount Due"), which was to accrue interest from August 1, 2016 at the rate of 15% per annum "or the maximum rate allowed by applicable law," *see* CSA § 2.  The CSA provided further that the Debtors were required to pay Seagrape the Cash Amount Due, plus interest, by January 2, 2017, *see* CSA § 10, unless they or "a third-party on behalf of [them]" paid Seagrape at least $1 million by January 2, 2017, in which case the Foreclosure Date would be "extended to March 31, 2017," *see* CSA§ 11.  Because Seagrape has alleged that the OP Defendants have not paid the above-mentioned amounts, and that the relevant due dates for payment have passed, *see, e.g.*, FAC ¶¶ 36, 56, 86, it has plausibly alleged that these Defendants breached the Agreements.

Seagrape has not, however, plausibly alleged that the OP Defendants breached the CSA by "bringing the BVI Proceeding to block the enforcement of [Seagrape's] rights as a creditor," *id.* ¶ 141, or by "engaging in a 'restructuring'" of the Project, "including the injection of new capital, without the prior notice and consent of [Seagrape]," *id.* ¶ 142.  First, it is unclear how the OP Defendants violated CSA § 11 by "bringing the BVI Proceeding" when Seagrape clearly alleges that it was Seagrape who first initiated proceedings within the BVI court system.  According to the Complaint, after Seagrape served a Statutory Demand on Obra Pia, Obra Pia "brought a legal proceeding in the BVI . . . seeking to set aside [that] Demand" based on certain counterclaims.  *See* FAC ¶¶ 106-07.  It is also not clear how the OP Defendants breached their obligation to "fully cooperate to facilitate Seagrape's foreclosing on the property and [] not [to] block such foreclosure or cooperate with anyone seeking to block it," CSA § 11, by responding to the Statutory Demand that Seagrape filed with an assertion of potentially off-setting counterclaims.  Second, although § 6 of the CSA provided that "any modification to the property rights of any of the Debtors on the Secured Assets, including any sale, mortgage, encumbrance, lien, or establishment of trust agreements in favor of any party, including equity holders, other than Seagrape, among others, must be first authorized in

38

writing by Seagrape unless at the closing of such transaction or transactions the Cash Amount Due is immediately paid to Seagrape in full," CSA § 6, Seagrape has not sufficiently alleged that the OP Defendants' engaged in any "modification to [] property rights" that would rise to the level of a violation of this section. Seagrape merely alleges that the OP Defendants' counsel stated, in October 2019, "that there had been a 'restructuring' of the Project, which involved an injection of new capital," and that Tuzman represented that there was "another party in the mix" and "new cap[ital] structure on our side." FAC ¶ 119. These allegations, without more, are not sufficient to demonstrate that there had been "any modification to the property rights of any of the Debtors on the Secured Assets" such that authorization from Seagrape was necessary.

Nevertheless, the Court rejects the OP Defendants' contention that Seagrape has failed to plead a breach of the CSA because Seagrape had "no right to recover or to seek foreclosure upon Obra Pia's assets under the CSA absent conditions precedent that have not yet occurred," namely, that the "Senior Debt" be fully paid.[14] *See* OPD Mot. at 22. As an initial matter, this argument appears to be focused not on the OP Defendants' alleged breach, but rather, on Seagrape's own performance under the relevant agreements. While Seagrape agreed that the debt Obra Pia owed to it would be "subordinate and junior in right of payment to the prior payment in full of the Senior Loan and the obligations under the Senior Loan Documents," and that it would not "declare a default with respect to any Subordinated Loan" or "exercise any rights with respect to any collateral securing the Subordinated Loans" without first providing the "Senior Lender," i.e., GACP, "at least three (3) months advanced notice," Subordination Agreement § 1(a), there is no language in the CSA or the

_____

[14] As "Senior Debt" is defined in the Subordination Agreement as "all debt owed by [Obra Pia] to any of the Subordinated Lenders," which "is and shall be subordinate and junior in right of payment to the prior payment in full of the Senior Loan and the obligations under the Senior Loan Documents, including any interest due thereunder," *see* Subordination Agreement Recital § 1(a), and "Senior Loan" is defined as the $1.5 million loan that GACP extended, *see* Subordination Agreement, Recital 2, the Court assumes that the OP Defendants' reference to "Senior Debt" in its motion, *see, e.g.*, OPD Mot. at 6, 22, refers to GACP's $1.5 million loan, or the "Senior Loan."

Subordination Agreement establishing that the Senior Loan must be fully repaid before Seagrape could declare a default or exercise its rights as a creditor.  To the contrary, based on the plain language of § 1(a), it appears that all Seagrape had to do before declaring a default or exercising its rights—assuming the Foreclosure Date had passed—was provide GACP three months notice of such an intent.  Nothing in § 1(a)—or elsewhere in the Subordination Agreement—contains language requiring the Senior Loan to be fully repaid before Seagrape could "declare a default" or "exercise any rights with respect to any collateral."  That Seagrape agreed to be "subordinate and junior" to GACP does not change this conclusion.[15]

Similarly, Seagrape has alleged its own performance under the relevant agreements.  "Cases dismissing breach of contract claims for failure to allege due performance have involved complaints that 'failed to make even a general allegation that [plaintiff] had performed its obligations under the contract.'"  *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 360 n.6 (S.D.N.Y. 2012) (quoting *Conergy AG v. MEMC Elec. Materials, Inc.*, 651 F. Supp. 2d 51, 62 n. 97 (S.D.N.Y. 2009)) (collecting cases).  Here, Seagrape has pleaded that it loaned the relevant amounts

---

[15] Moreover, pursuant to § 1(b) of the Subordination Agreement, the parties agreed that, as to the "prior funding of Obra Pia" and the Development, governed by the Investment Agreement, Addendum, and/or CSA, they would "not [] foreclose until March 31st, 2017" and would "waive any [] restriction in any of the foregoing documents that might otherwise restrict, prohibit, create a breach or an event of default thereunder in connection with the transaction contemplated under the Senior Loan Documents."  Subordination Agreement § 1(b).  This language evinces the parties' intent to allow Seagrape to foreclose under the terms of the CSA, so long as GACP was provided three months notice pursuant to § 1(a). Based on a plain reading of the CSA and the Subordination Agreement, Seagrape was authorized to declare a default and exercise its rights after March 31, 2017, as long as it provided the requisite notice to GACP.  Additionally, § 2 of the Subordination Agreement appears to contemplate that a Subordinated Lender may declare a default prior to the Senior Loan being repaid in full.  Section 2 provides that "[i]f during the continuation of an event of default . . . , a payment or distribution is made to any Subordinated Lender that because of this Agreement should not have been made to them, such Subordinated Lender who receives the distribution shall hold it in trust for the Senior Lender, segregated from other funds and property held by such Subordinated Lender, and pay it over to the Senior Lender."  Subordination Agreement § 2. The Agreement thus provided for the situation in which a Subordinated Lender, like Seagrape, declared a default and received a certain amount, even before GACP's loan was fully repaid.  In that event, Seagrape would be required to hold in trust the amount owed to GACP—i.e., the $1.5 million payment—and pay it over to GACP.  If Seagrape was prohibited from taking any such actions prior to GACP being repaid, as Plaintiffs contend, then § 2 would be superfluous.  *See Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11 Civ. 5832 (AJN), 2012 WL 3542196, at *5 (S.D.N.Y. Aug. 15, 2012) ("A contract should be read as a whole . . . to avoid an interpretation that would render a provision superfluous.").

of money under the Investment Agreement, the Addendum, and the CSA, *see, e.g.*, FAC ¶¶ 56, 86, and that it abstained from foreclosing, declaring a default, or otherwise exercising its rights as a creditor until the March 31, 2017 Foreclosure Date elapsed and it provided GACP with the requisite written notice, *see id.* ¶ 98.  The Court finds that—particularly at this stage, where the allegations in the Complaint must be accepted as true and all reasonable inferences drawn in Seagrape's favor—it has sufficiently pleaded "adequate performance" under the agreements.

Finally, the Complaint plausibly alleges damages for purposes of Seagrape's breach of contract claim.  "[D]amages for breach of contract should put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract."  *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002).  Here, Seagrape pleads that, if the OP Defendants had fulfilled their obligations under the agreements, it would have—at the least—been repaid the Cash Amount Due.  *See, e.g.*, FAC ¶¶ 86, 136, 143.

For these reasons, Seagrape has stated a claim for breach of contract.  Accordingly, the OP Defendants' motion to dismiss this cause of action is denied.

### D.  Breach of Fiduciary Duties

Against Tuzman, Davi, Blaurock, KIT Nevis, Obra Pia, OP Feeder, and OP Manager, Seagrape asserts a cause of action for breach of fiduciary duties.  Seagrape maintains that these Defendants owned fiduciary duties of care and loyalty to Seagrape as a result of Seagrape's investment in the LP Units of OP Feeder.  *See* FAC ¶ 148.

"To state a claim for breach of fiduciary duty under New York law, a plaintiff must allege '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'"  *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 206 (S.D.N.Y. 2014) (quoting *Varveris v. Zacharakos*, 110 A.D.3d 1059, 1059 (2d Dep't

2013)).[16]  "A fiduciary relationship exists under New York law when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios, L.L.C.*, 355 F. App'x 516, 519 (2d Cir. 2009) (quoting *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991).  "In determining whether a fiduciary duty exists, the focus is on whether one person has reposed 'trust or confidence in another' and whether the second person accepts the trust and confidence and 'thereby gains a resulting superiority or influence over the first.'"  *Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008) (quoting *Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006)); *see also Grewal v. Cuneo*, No. 13-CV-6836 RA, 2015 WL 4103660, at *11 (S.D.N.Y. July 7, 2015), *aff'd sub nom. Grewal v. Cuneo Gilbert & LaDuca LLP*, 803 F. App'x 457 (2d Cir. 2020) ("Under New York law, breach of fiduciary duty is a tort that arises from a violation of a relationship of trust and confidence.") (alteration, internal quotation marks, and citation omitted); *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, No. 00 Civ. 6270 (DC), 2002 WL 392291, at *4 (S.D.N.Y. Mar. 13, 2002) ("New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.") (citation omitted).  Moreover, in order "to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship."  *Poon v. Roomorama, LLC*, No. 09 Civ. 3224 (RMB), 2009 WL 3762115, at *3 (S.D.N.Y. Nov. 10, 2009) (quoting *World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 530 F.

---

[16] The Court rejects Seagrape's argument that BVI law applies to its breach of fiduciary duties claim for the same reasons discussed in the Obra Pia Opinion, *see* Obra Pia Opinion at 19-22, and in light of the fact that Seagrape cites only Second Circuit and New York law—and no BVI law—in connection with this claim, *see* Opp'n to OPD Mot. at 25-26.  As to the remainder of the claims asserted against the OP Defendants in this action, the parties agree that New York law applies. *See* Seagrape Supp. Ltr.; OPD Supp. Ltr.

Supp. 2d 486, 504 (S.D.N.Y. 2007)).

It appears that Seagrape alleges the existence of a fiduciary relationship solely based on its investment in OP Feeder, as well as the assertion that "[KIT Nevis], [OP Manager], [Obra Pia], Tuzman, Blaurock[,] and Davi" are "officers, directors[,] and affiliates" of OP Feeder. *See* Opp'n at 25; *see also* FAC ¶ 148 ("As a result of Plaintiff's investment in LP Units of OP Feeder, Defendants Tuzman, Blaurock, Davi, [KIT Nevis], [Obra Pia], OP Manager and OP Feeder owed Plaintiff fiduciary duties of care and loyalty."). To support the latter claim—regarding the individuals and entities other than OP Feeder—Seagrape alleges that Tuzman, Blaurock, and Davi were "senior officers of [KIT Nevis]" at all relevant times, FAC ¶ 145, that KIT Nevis was "the 100% owner" of both OP Manager and Obra Pia, *see id.* ¶¶ 146-47, that OP Manager was "the General Partner of OP Feeder," and that OP Feeder "in turn held a convertible note issued by [Obra Pia]," *id.* ¶ 146.

OP Manager is the only entity that—according to the allegations in the Complaint—is plausibly alleged to have owed Seagrape a fiduciary duty. A "managing or general partner of a limited partnership is bound in a fiduciary relationship with the limited partners." *Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1058 (S.D.N.Y. 1992) (quoting *Riviera Congress Assocs. v. Yassky*, 18 N.Y.2d 540, 547 (1966)). Seagrape alleges that OP Manager "was the General Partner of OP Feeder," and that Seagrape—through its purchase of LP Units of OP Feeder—was a limited partner. *See* FAC ¶¶ 146, 148. As to the other Defendants, however, while it is well established that "partners owe fiduciary duties to co-partners," *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009), and that both general partners and corporate directors alike owe fiduciary duties to "limited partners [and/or] shareholders who rely on the integrity of the general partner and corporate directors . . . to manage the business into which those passive investors have placed their funds," *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989), Seagrape has not plausibly alleged that Tuzman, Davi, Blaurock, KIT Nevis, or Obra Pia were co-partners in OP Feeder, directors or officers

of OP Feeder, or otherwise owed Seagrape fiduciary duties simply because Seagrape was issued LP Units in OP Feeder.  Nor are any of these individuals or entities alleged to be the general partner of OP Feeder.  Moreover, Seagrape fails to plausibly allege—or argue in its opposition—that OP Feeder, as the limited partnership itself, owed Seagrape, as a limited partner, any such fiduciary duties.  Thus, the only entity that reasonably owed Seagrape any fiduciary duties was OP Manager, as the General Partner of OP Feeder.[17]

Seagrape's breach of fiduciary duties claim as to OP Manager nonetheless fails because Seagrape has not plausibly alleged that OP Manager itself breached any fiduciary duties.  Seagrape contends generally that Tuzman, Davi, Blaurock, KIT Nevis, Obra Pia, OP Feeder, and OP Manager all breached their fiduciary duties to Seagrape by: (1) making the material misrepresentations and omissions discussed in the context of its fraud claims; (2) "[a]llowing [KIT Nevis] to apply at least $379,000 of invested funds on personal luxury items" and "to apply a portion of the funds lent by GACP to pay Tuzman's own personal living expenses"; (3) "[f]alsely representing to investors, including [Seagrape], that [KIT Nevis] had invested $19 million in 'hard cash' on the Project"; (4) "refusing," after Tuzman's indictment, "to accept reasonable offers for the sale of the Project, which would have fully paid [Seagrape]"; (5) "[c]olluding with GACP to induce [Seagrape] and other investors to accept a haircut on their returns in exchange so that GACP could achieve a lower effective

---

[17] Although the OP Defendants specifically argued in their motion that "Seagrape fails to allege the nature of duty owed as to each Defendants," among other things, *see* OPD Mot. at 24, in its opposition, Seagrape did not expand on what duties these Defendants owed Seagrape or why.  Rather, Seagrape merely asserted that "Defendants have not cited any BVI law establishing that Seagrape cannot bring a cause of action for breach of fiduciary duties against OP Feeder.  However, even if Seagrape could not do so, that would not prevent Seagrape from stating such a claim against the officers, directors and affiliates of OP Feeder . . . ."  Opp'n to OPD Mot. at 25.  Yet Seagrape cited no BVI law to support such a proposition.  In any event, Seagrape's claim for breach of fiduciary duties would fail under BVI law as well.  *See, e.g.*, *Seghers v. Thompson*, No. 06-CV-308 (RMB) (KNF), 2006 WL 2807203, at *7 (S.D.N.Y. Sept. 27, 2006) (concluding that the "breach of fiduciary duty claim fail[ed] under the laws of either New York or the British Virgin Islands" because, among other things, "[g]enerally, under British law, directors owe duties to the company, and not the individual stockholders") (quoting *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 116 (S.D.N.Y. 1999)); *Dragon Inv. Co. II LLC v. Shanahan*, 49 A.D.3d 403, 404 (1st Dep't 2008) (explaining that "under British Virgin Islands law, . . . which follows English law, a director [] does not owe a fiduciary duty to shareholders [] unless there is a special factual relationship between them").

44

purchase price and [KIT Nevis]/Tuzman could achieve an unjustified return on equity"; (6) "[r]esisting foreclosure by means of the Statutory Demand under BVI law"; and (7) "[f]ailing to provide [Seagrape] with contemporaneous updates and financial information" about the Project. *See* FAC ¶ 149. But the Complaint contains no factual allegations connecting any of the aforementioned alleged breaches with OP Manager in particular. Indeed, Seagrape's securities fraud and common law fraud claims, for instance, are not even asserted against OP Manager. Accordingly, Seagrape fails to plausibly allege that OP Manager breached any duty that it may have owed by virtue of its status as General Partner of OP Feeder.

Because Seagrape has failed to sufficiently plead that it was in a fiduciary relationship with Tuzman, Davi, Blaurock, KIT Nevis, Obra Pia, or OP Feeder, or that OP Manager breached any fiduciary duties owed to it, its breach of fiduciary duties claim must be dismissed.

## II.     Garland's and Elan's Motions to Dismiss

Seagrape asserts two claims against the OP Defendants' prior attorneys, Defendants Garland and Elan: (1) aiding and abetting breach of fiduciary duty, and (2) violations of Judiciary Law § 487. The Court addresses each in turn.

### A.  Aiding and Abetting Breach of Fiduciary Duty

First, Seagrape alleges a claim for aiding and abetting breach of fiduciary duty against Garland and Elan, based the alleged breaches of fiduciary duties discussed above. To state a claim for aiding and abetting a breach of fiduciary duty under New York law,[18] a plaintiff must allege: (1) "a breach

---

[18] Although Seagrape argues generally in its supplemental letter that its aiding and abetting breach of fiduciary duty claim is governed by BVI law "to the extent that [it] arise[s] from conduct by or relating to entities organized under the laws of the BVI," it also states that "[t]o the extent the claim[] arise[s] from conduct by or relating to entities not organized under the law of the BVI, . . . the claim[] would be governed by New York law." *See* Seagrape Supp. Ltr. at 2. Additionally, in its motion papers, Seagrape cites only New York law in its oppositions to Garland's and Elan's motions to dismiss, including with respect to the aiding and abetting breach of fiduciary duty claim. Moreover, the actions of Garland and Elan underlying the aiding and abetting claim consist of their filings in the BVI Court and in connection with the Obra Pia Action, and do not arise solely—or primarily—from conduct by or relating to OP Feeder alone. The Court thus finds that New York law applies to this claim as well.

by a fiduciary of obligations to another, of which the aider and abettor had actual knowledge," (2) "that the defendant knowingly induced or participated in the breach," and (3) "that plaintiff suffered damage as a result of the breach." *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005) (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003)) (internal quotation marks omitted). "To participate knowingly means to have actual knowledge, as opposed to merely constructive knowledge, . . . and a plaintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty." *Meisel*, 651 F. Supp. 2d at 115 (alterations, internal quotation marks, and citation omitted). Additionally, "[t]he aider and abettor must [] provide substantial assistance to the primary violator." *Id.* Under New York law, "[s]ubstantial assistance may only be found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'" *In re Sharp Int'l*, 403 F.3d at 50 (quoting *Kaufman*, 307 A.D.2d at 126). "Inaction," however, "constitutes substantial assistance only where the alleged aider and abettor owes a fiduciary duty directly to the plaintiff." *Meisel*, 651 F. Supp. 2d at 115.

Seagrape alleges that Garland and Elan knew, or were reckless in not knowing, that Seagrape "duly provided the Senior Lender Notice to GACP on April 27, 2017 and, no more than three months thereafter, was entitled to exercise its rights as a creditor under the CSA and Subordination Agreement." *See* FAC ¶ 153. Accordingly, Garland and Elan allegedly aided and abetted the primary breaches of fiduciary duties by "filing the false and misleading" initial complaint in the related Obra Pia Action, "without which"—Seagrape alleges—Obra Pia "would have [been] required to pay the Cash Amount Due to Seagrape 'immediately,' or else face liquidation" under "the terms of the BVI Court's Judgment." *See id.* ¶ 154. Garland also allegedly aided and abetted the breaches of fiduciary duties by "presenting false and misleading statements of fact and law to the BVI Court," which

46

purportedly "defrauded the BVI Court and induced it to set aside the Statutory Demand upon false premises." *See id.*

Because Seagrape has failed to allege a "primary breach of fiduciary duty" by Tuzman, Blaurock, Davi, KIT Nevis, Obra Pia, OP Manager, or OP Feeder, however, it has "failed to state a claim against [Garland and Elan] for aiding and abetting a breach of fiduciary duty." *Teachers Ins. & Annuity Ass'n of Am. v. CRIIMI Mae Servs. Ltd. P'ship*, No. 06 Civ. 0392 (LAK), 2007 WL 7569162, at *1 (S.D.N.Y. Sept. 7, 2007), *aff'd,* 481 F. App'x 686 (2d Cir. 2012); *see also, e.g.*, *Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236, 251 (S.D.N.Y. 2012) ("With the dismissal of [the] claim[] for . . . breach of fiduciary duty, the claim for aiding and abetting should be dismissed for failure to plead a primary violation."); *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *27 (S.D.N.Y. July 27, 2009) ("Plaintiffs have not stated a claim for a breach of fiduciary duty, and in the absence of sufficient allegations of a primary breach, the claim for aiding and abetting a breach of fiduciary duty must also fail."). Seagrape's aiding and abetting breach of fiduciary duty claim is therefore dismissed.

## B. Judiciary Law § 487

"New York Judiciary Law § 487 gives an injured party a cause of action against an attorney who '[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party.'" *Haggerty v. Ciarelli & Dempsey*, 374 F. App'x 92, 93 (2d Cir. 2010). "Section 487 thus permits a civil action to be maintained by any party who is injured by an attorney's intentional deceit or collusion in New York on a court or on any party to litigation . . . ." *Amalfitano v. Rosenberg*, 533 F.3d 117, 123 (2d Cir. 2008). To state a claim for a violation of Judiciary Law § 487, a plaintiff must show, "at a bare minimum, 'that defendants: (1) are guilty of deceit or collusion, or consent to any deceit or collusion; and (2) had an intent to deceive the court or any party.'" *Ray v. Watnick*, 182 F. Supp. 3d 23, 28 (S.D.N.Y. 2016), as amended (May 4, 2016), *aff'd,* 688 F. App'x 41

(2d Cir. 2017) (citation omitted); *see also Bryant v. Silverman*, 284 F. Supp. 3d 458, 472 (S.D.N.Y. 2018) (explaining that § 487 "is not a codification of a common-law cause of action for fraud" and that "the operative language at issue—'guilty of any deceit'—focuses on the attorney's intent to deceive, not the deceit's success") (internal quotation marks and citation omitted). "[A] plaintiff also has to establish that damages were caused by the deceit in order to succeed on a Section 487 claim." *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, 419 F. Supp. 3d 668, 710 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).

Moreover, "numerous New York State courts interpreting [§ 487], as well as federal courts construing the state court decisions, have concluded that liability attaches under this law only if the deceit is 'extreme' or 'egregious.'" *Ray*, 182 F. Supp. 3d at 29 (collecting cases). Indeed, "[b]y confining the reach of the statute to intentional egregious misconduct, this rigorous standard affords attorneys wide latitude in the course of litigation to engage in written and oral expression consistent with responsible, vigorous advocacy, thus excluding from liability statements to a court that fall well within the bounds of the adversarial proceeding." *Id.* (quoting *O'Callaghan v. Sifre*, 537 F. Supp. 2d 594, 596 (S.D.N.Y. 2008)) (internal quotation marks omitted). "Under this threshold, an action grounded essentially on claims that an attorney made meritless or unfounded allegations in state court proceedings would not be sufficient to make out a violation of § 487." *Id.* In addition, there is also "significant authority for the proposition that Section 487 should be applied only to a chronic and extreme pattern of legal delinquency," *Kirk v. Heppt*, 532 F. Supp. 2d 586, 593 (S.D.N.Y. 2008), although "the Second Circuit has noted that no such requirement exists in the statute and that other courts 'have found attorneys liable under [] the statute for a single intentionally deceitful or collusive act,'" *Polanco v. NCO Portfolio Mgmt., Inc.*, 23 F. Supp. 3d 363, 375 (S.D.N.Y. 2014) (quoting *Amalfitano*, 533 F.3d at 123-24).

Seagrape contends that Garland "engaged in deceit and collusion in New York," with the "intent to deceive both the BVI court in the BVI Proceeding and the court in the [related Obra Pia Action]" by "knowingly basing [his] Affidavit in the BVI Proceeding and the Complaint in the [related Obra Pia Action] upon materially false facts," which—Seagrape alleges—was intended to "block[] [Seagrape's] due payment under the terms of the CSA, Investment Agreement and Addendum." *See* FAC ¶¶ 157-58. Similarly, Seagrape asserts that Elan "engaged in deceit and collusion in the State of New York with the intent to deceive the court in the [related Obra Pia Action]." *Id.* ¶ 157. According to Seagrape, both Garland and Elan violated § 487 by "falsely represent[ing] to the Court, as a fact, that Seagrape had not provided the Senior Lender Notice, or [by] unlawfully [failing] to disclose this fact." *Id.* ¶ 159.

Seagrape's § 487 claim fails because it has not plausibly alleged that either Garland or Elan made any statements with "an intent to deceive the court or any party." The Complaint is devoid of allegations that, in either the BVI Proceeding or the related Obra Pia Action, Garland or Elan *knowingly* made false statements with respect to whether Seagrape had delivered the requisite notice under the Subordination Agreement. In fact, although Seagrape argues that Garland and Elan each "knew" their representations in the BVI Proceeding and/or related Obra Pia Action "to be false," *see* Opp'n to Garland Mot. at 14; Opp'n to Elan Mot. at 15, it points to no factual allegations actually demonstrating such knowledge. And indeed, there appear to be no such factual allegations in the Complaint. Seagrape has thus failed to establish that any of their statements were "intentionally deceitful"—a failure fatal to its § 487 claim against them. *See, e.g.*, *Ray*, 182 F. Supp. 3d at 28-29 ("[P]laintiff has wholly failed to make out a plausible claim that defendants' statements were intentionally deceitful. On this ground alone, the Complaint must be dismissed."); *see also Bryant*, 284 F. Supp. 3d at 472 ("[C]ourts have also held that an assertion of unfounded allegations in a pleading, even if made for improper purposes, does not provide a basis for liability under Section

49

487.") (quoting *Tacopina v. Kerik*, No. 14 Civ. 749 (LTS) (FM), 2016 WL 1268268, at *6 (S.D.N.Y. Mar. 31, 2016)) (alterations and internal quotation marks omitted).  Nor has Seagrape alleged that any of Garland's or Elan's alleged deceit was "extreme" or "egregious," or that either attorney's conduct was "indicative of 'chronic and extreme delinquency.'"  *Kirk*, 532 F. Supp. 2d at 593; *see also Ray*, 182 F. Supp. 3d at 29 ("[E]ven assuming *arguendo* that at least one of the allegedly false statements had been adequately alleged to be intentionally deceitful, the Complaint would still have to be dismissed for failure to adequately allege that the deceit was extreme or egregious."); *Savitt v. Greenberg Traurig, LLP*, 126 A.D.3d 506, 507 (1st Dep't 2015) (dismissing § 487 claims because "the complaint fail[ed] to show either a deceit that reaches the level of egregious conduct or a chronic and extreme pattern of behavior on the part of the defendant attorneys") (internal quotation marks and citation omitted).  For this reason too, Seagrape's § 487 claim fails.  Accordingly, Seagrape's claim for violations of Judiciary Law § 487 must be dismissed.

## CONCLUSION

For the reasons set forth above, the OP Defendants' motion to dismiss is granted in part and denied in part.  Specifically, the Court grants their motion as to Seagrape's first cause of action for violations of Section 10(b) and Rule 10b-5, second cause of action for common law fraud, and fourth cause of action for breach of fiduciary duties, but denies it as to Seagrape's third cause of action for breach of contract.  Defendants Garland's and Elan's motions to dismiss are granted in full. According to the docket, Defendants Blaurock and Davi have not yet appeared in this action.  No later than October 2, 2020, Seagrape shall file a letter explaining when and how it effectuated service upon Defendants Blaurock and Davi, whether it has been in contact with these Defendants, and whether it intends to move for a default judgment against them.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 39, 42, 43, 44, and 48.

SO ORDERED.

Dated:     September 25, 2020
           New York, New York

Ronnie Abrams
United States District Judge