USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SEAGRAPE INVESTORS LLC,

                Plaintiff,

       v.

KALEIL ISAZA TUZMAN, KIT CAPITAL
LTD., KIT CAPITAL (NEVIS) LLC, OBRA PIA
LTD., OBRA PIA (U.S.) FEEDER, LP, OBRA
PIA MANAGEMENT, GP, LTD., OBRA PIA
LTD., SURCUSAL COLOMBIA, AMANDA
BLAUROCK, ROSARIO DAVI, JOSEPH P.
GARLAND, and KENNETH A. ELAN,

                Defendants.

No. 19-cv-9736 (RA)

MEMORANDUM
OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

      Plaintiff Seagrape Investors LLC ("Seagrape") brings this breach of contract action against Defendants Kaleil Isaza Tuzman ("Tuzman"), KIT Capital Ltd. ("KIT Capital"), KIT Capital (Nevis) LLC ("KIT Nevis"), Obra Pia Ltd. ("OP BVI"), Obra Pia (U.S.) Feeder, LP ("OP Feeder"), Obra Pia Management, GP, Ltd. ("OP Manager"), and Obra Pia Ltd., Surcusal Colombia ("OP Colombia," and collectively with the aforementioned Defendants, the "OP Defendants"), as well as individuals Amanda Blaurock, Rosario Devi, Joseph Garland, and Kenneth Elan. On September 23, 2022, the Court issued a ruling denying Seagrape's motion for summary judgment without prejudice and ordered supplemental briefing with respect to a subordination agreement between several of the parties. Now pending before the Court is Seagrape's renewed motion for summary judgment.

**BACKGROUND**

The Court assumes the parties' familiarity with the lengthy factual background and procedural history of this action, and will only summarize the facts relevant to the instant motion.[1] This dispute arises from Seagrape's investment in the development of Defendant Tuzman's luxury hotel project in Cartagena, Colombia, known as "Convento Obra Pia" (the "Project"). In 2016, after the Project had encountered a series of setbacks, a third-party named GACP Latin American Partners LLC ("GACP") agreed to purchase the Project. In order to facilitate GACP's purchase, Seagrape entered into a Credit and Security Acknowledgement (the "CSA") with Tuzman, OP BVI, OP Colombia, OP Manager, and KIT Nevis with respect to the outstanding debt owed to Seagrape.

Around the same time, GACP agreed to provide OP BVI with a $1.5 million "bridge loan" (the "Senior Loan") governed by a subordination agreement (the "Subordination Agreement"), which was divided into a $1 million payment to Seagrape and a $500,000 payment going towards "expenses of the Project." First Am. Compl. ¶ 91. The Subordination Agreement identifies GACP as the "Senior Lender"; Seagrape, OP Feeder, Obra Pia (Non-U.S.) Feeder, and KIT Capital as "Subordinated Lender[s]"; and OP BVI as the "Borrower." Subordination Agreement at 1. In return for this bridge loan, Seagrape and the other Subordinated Lenders agreed to subordinate "all debt owed by [OP BVI]" to the "prior payment in full of the Senior Loan" to GACP. *Id.* § 1(a). Three years later, GACP assigned the Senior Loan, as well as its interest in the Subordination Agreement, to Innocreative Capital, LLC ("Innocreative"). The parties executed a First

---

[1] The factual background of this action has been detailed, among elsewhere, in the Court's Opinion and Order dated September 25, 2020. *Seagrape Invs. LLC v. Tuzman*, 2020 WL 5751232, at *1-12 (S.D.N.Y. Sept. 25, 2020).

Amendment to the Senior Loan Documents, which requires OP BVI to deliver its outstanding debts—consolidated into a Credit Line Note—to Innocreative.

In its September 23 decision, the Court ruled that Seagrape is entitled to the cash amount due under the CSA. The only remaining issue on summary judgment is whether the Senior Loan held by GACP pursuant to the Subordination Agreement is still outstanding, or whether it was extinguished, as Seagrape argues, when GACP assigned its rights to Innocreative.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (internal quotation marks omitted). In determining whether there is a genuine issue of material fact, the Court must view all facts "in the light most favorable to the non-moving party." *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

## DISCUSSION

Seagrape makes three arguments: (1) the Senior Loan is no longer outstanding because it was extinguished by the First Amendment to the Senior Loan Documents; (2) subordination is a question of priority, not liability, such that the Senior Loan does not preclude the entry of judgment at this time even if it remains outstanding; and (3) the Subordination Agreement does not subordinate Seagrape's right to payment from four of the other OP Defendants—specifically, Tuzman, OP Manager, KIT Nevis, and OP Colombia—and judgment may thus be immediately enforced against them. The Court will address each argument in turn.

### I. Whether the Senior Loan Remains Outstanding

Whether the Senior Loan remains outstanding depends on the terms of the relevant contracts. "When interpreting an unambiguous contract, words and phrases are given their plain meaning," *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (internal quotation marks omitted), and courts "disfavor contract interpretations that render provisions of a contract superfluous," *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002). In other words, contracts must be read "as a whole," and "courts applying New York law construe a contract so as to give full meaning and effect to all of its provisions." *In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013) (internal quotation marks omitted).

Seagrape relies primarily on a single provision, Section 1(e) of the First Amendment to the Senior Loan Documents, to argue that the Senior Loan has been extinguished. That section reads: "Pursuant to this Agreement, upon the execution of the Credit Line Note, the Notes and Legal Loan Agreement shall no longer be deemed effective and the obligations of the Borrower thereunder shall be deemed extinguished, except as otherwise set forth herein."[2] Subordination Agreement § 1(e).

As the final clause suggests, however, there are several other provisions of relevance. In the Second Recital of the Subordination Agreement, the parties define the "Senior Loan" as the principal amount of $1.5 million "as modified, amended, renewed, extended, restated, or replaced from time to time."[3] *Id.* at 1. The parties thus contemplated that the original Senior Loan could be modified or replaced by a new debt, and it appears that is precisely what happened. Section 3

---

[2] The First Amendment to the Senior Loan Documents defines the Senior Loan in question as "Note 1," encompassed in the collective "Notes" mentioned in Section 1(e). *See* First Am. to the Senior Loan Documents at 1. The other defined "Notes"—Notes 2 through 4—are not relevant to this analysis.

[3] Similarly, in the same provision, the parties defined the "Senior Loan Documents" as "all other documents, agreements, and instruments now or hereafter executed in connection therewith, all as modified, amended, renewed, extended, restated, or replaced from time to time." Subordination Agreement at 1.

4

of the First Amendment to the Senior Loan Documents adds the following language as Recital 5 to the Subordination Agreement: "On September 1, 2019, the Senior Loan . . . was *replaced* by that certain Amended and Restated Consolidated Secured Credit Line Note, dated as of September 1, 2019 (the 'Credit Line Note'), executed by Borrower and delivered to Senior Lender's successor-in-interest, Innocreative Capital, LLC." First Am. to the Senior Loan Documents § 3 (emphasis added). In addition, Paragraph 1.10 of the Credit Line Notes states that it "shall rank as senior to those other debts of [OP BVI] as set forth in the Subordination Agreement, as modified by the [First] Amendment," which further confirms that the Credit Line Note was intended to replace the Senior Loan, taking its senior position in the priority of payment. Credit Line Note ¶ 1.10.

Seagrape also points to Section 1(a) of the Subordination Agreement, which, it urges, establishes that the Senior Loan was "the only loan to which Seagrape agreed to subordinate its right to payment." Pl. Br. 9. But again, that is not what the plain terms of the Subordination Agreement say. The Subordination Agreement expressly contemplates that the Senior Loan can be "modified," "amended," or "replaced," and it placed no discernible limits on those modifications.[4] Subordination Agreement at 1. The Court thus finds that the Senior Loan was replaced by the Credit Line Note, and Seagrape's debt remains subordinated accordingly.

## II.    Whether the Senior Loan Precludes Entry of Judgment

Seagrape next argues that, even if a more senior loan remains outstanding, that would not preclude entry of judgment at this time, because subordination is only a matter of priority, not liability. The Court agrees.

---

[4] To the extent Seagrape contends that the First Amendment to the Senior Loan Documents is invalid because Seagrape did not agree to subordinate its loan to Innocreative, that argument is also foreclosed by the plain terms of the Subordination Agreement allowing the Senior Loan to be "modified," "amended," or "replaced." Subordination Agreement at 1.

Courts have previously observed that "[s]ubordination affects only the *priority* of debt, not the *existence* of the underlying liability," and a subordination agreement accordingly "impacts only [the lender's] right to collect, not its entitlement to judgment." *Imtrac Indus., Inc. v. Glassexport Co., Ltd.*, 1996 WL 39294, at *6 (S.D.N.Y. Feb. 1, 1996) (emphasis in original); *see also Kornfield v. NRX Techs., Inc.*, 461 N.Y.S.2d 342, 343 (App. Div. 1983), *aff'd*, 62 N.Y.2d 686 (1984) ("Any question in terms of priority as to the rights of the plaintiffs as against other creditors has no bearing upon the plaintiffs' right to judgment as against the [defendants]."); *Minority Equity Cap. Co., Inc. v. Jackson*, 798 F. Supp. 200, 202-03 (S.D.N.Y. 1992) (entering judgment in favor of the lender but deferring collection on the judgment until the senior debt had been paid). This Court reached the same conclusion in its opinion dismissing the related *Obra Pia* action, reasoning that "[n]othing in § 1(a)—or elsewhere in the Subordination Agreement—contains language requiring the Senior Loan to be fully repaid before Seagrape could 'declare a default' or 'exercise any rights with respect to any collateral.'" *Obra Pia Ltd. v. Seagrape Invs. LLC*, 2020 WL 5751195, at *14 (S.D.N.Y. Sept. 25, 2020); *see also id.* at *15 (reasoning that "Section 2 of the Subordination Agreement supports [the same] conclusion," because it "provide[s] for the situation in which a Subordinated Lender, like Seagrape, declared a default and received a certain amount, even before GACP's loan was fully paid . . . Seagrape would be required to hold in trust the amount owed to GACP—i.e., the $1.5 million payment—and pay it over to GACP").[5] Judgment may thus be entered in favor of Seagrape at this time, even if it cannot yet collect from Defendant OP BVI.

The only case OP Defendants cite to the contrary is *Standard Brands, Inc. v. Straile*, 260 N.Y.S.2d 913 (App. Div. 1965), but that case does not compel a different result. There, the New

---

[5] The parties dispute whether the Court's opinion in the related case is binding in this action, but regardless, the Court finds its prior reasoning to be applicable here, as it involves an interpretation of the same Subordination Agreement between the same parties.

York Appellate Division differentiated between two "basic types" of subordination clauses: (1) "inchoate" subordination, which gives priority to senior creditors on the debtor's assets and "becomes operative only when a voluntary or involuntary distribution of the debtor's assets is made to creditors," and (2) "complete" or "general" subordination, which "forbids or limits payments by the debtor on the subordinated debt as long as the senior debt remains unpaid." *Id.* at 916. The court explained that, if the subordination is "inchoate," "the [subordination] clause does not prevent the subordinated creditor from reducing his claim against the debtor to a judgment." *Id.* Only where the subordination is "complete" would there be "no right to payment from the debtor and no action would lie against the debtor," given that "the debtor is also in default to the senior creditors." *Id.* at 917.

Whether a subordination clause should be considered "inchoate" or "complete" depends on the terms of the agreement itself. *See id.* at 917 (identifying terms in the contract that "suggest, but do not compel, the conclusion that a 'general' subordination was intended"); *see also Jackson Nat. Life Ins. Co. v. Ladish Co., Inc.*, 1993 WL 43373, at *8 (S.D.N.Y. Feb. 18, 1993) (identifying terms in the contract that "imply that 'complete' subordination was intended"). Here, as the Court previously concluded, there is "[n]othing in § 1(a)—or elsewhere in the Subordination Agreement—contain[ing] language requiring the Senior Loan to be fully repaid before Seagrape could 'declare a default' or 'exercise any rights with respect to any collateral.'" *Obra Pia*, 2020 WL 5751195, at *14. Indeed, the Subordination Agreement suggests that a Subordinated Lender may declare a default with respect to a Subordinated Loan at any time, as long as the Subordinated Lender "provid[es] the Senior Lender at least three (3) months advanced notice." Subordination Agreement § 1(a). And as the Court observed in *Obra Pia*, the Subordination Agreement "provide[s] for the situation in which a Subordinated Lender, like Seagrape, declare[s] a default

7

and receive[s] a certain amount[] even before GACP's loan was fully repaid," in which case the amount owed to GACP would be held over in trust. *Id.* at *15 (citing Subordination Agreement § 2). The Subordination Agreement is thus more akin to an "inchoate" subordination than a "complete" subordination, and the *Straile* decision does not foreclose an entry of judgment in favor of Seagrape at this time.

### III.   Other Obra Pia Debtors

Third, Seagrape argues that it never subordinated its right to payment from four other OP Defendants—Tuzman, OP Manager, KIT Nevis, and OP Colombia—and it thus should be able to collect from them immediately.

The Court here again agrees with Seagrape. The Subordination Agreement only identifies one "Borrower"—OP BVI—and subordinates Seagrape's debt only to that specific loan. *See* Subordination Agreement at 1 ("This Subordination Agreement . . . is made as of October 14, 2016 by and among . . . Obra Pia, Ltd., a company existing under the laws of the British Virgin Islands ('Borrower')."). OP Defendants argue that the other Obra Pia debtors were also signatories of the Subordination Agreement, but the effect of signing an agreement is merely to bind the parties to it, not to rewrite the terms of the contract. OP Defendants also argue that Seagrape's reading of the Subordination Agreement would subvert its purpose, because Seagrape could make an "end-run" around the Senior Loan by suing the other Obra Pia debtors. Def. Opp. 10. However, "if [a] contract is capable of only on reasonable interpretation, *i.e.*, is unambiguous, [courts] 'are required to give effect to the contract as written.'" *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir. 1993)); *see also Blue Stone Ent. LLC v. AGS CJ Corp.*, 2022 WL 760748, at *2 (2d Cir. Mar. 14, 2022) (quoting *K. Bell & Accocs., Inc.*, 97 F.3d at 637) (declining to consider the "purpose

8

and broader context" of the contract where its plain text was "capable of only one reasonable interpretation"). The Court thus declines to depart from the plain meaning of the Subordination Agreement, and finds that Seagrape only subordinated its right to payment from Defendant OP BVI.

## IV. Attorney's Fees

Finally, Seagrape moves for an award of $443,155.91 in attorney's fees and costs. Attorney's fees are generally unavailable "unless a statute or contract provides otherwise." *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 590 (2d Cir. 2016) (quoting *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015)). Here, the CSA incorporates an investment agreement entered into between Seagrape's principal, Edward Mullen, and Tuzman on May 1, 2013 (the "Investment Agreement,"), which provides, in relevant part:

> If . . . this Agreement is referred to any attorney by necessity in order to collect any sum payable hereunder or to defend or enforce any of Investor's rights hereunder, or to commence an action or claim by Investor against Recipient, Guarantor or the Holding Company relating to this Investment Agreement, Recipient and/or Guarantor shall reimburse Investor for all costs incurred in connection therewith including attorney's fees . . . in addition to all costs, disbursements and allowances provided by law.

Investment Agreement § 12. Tuzman was designated the "Guarantor" in the Investment Agreement, and the "Recipient" was defined as his entity, KIT Media, Ltd. ("KIT Media"). In an Addendum to the Investment Agreement executed on September 19, 2014 (the "Addendum"), KIT Media was replaced by OP Feeder as the "Recipient"; KIT Capital and OP BVI were added as "Guarantors"; and Mullen was replaced by Seagrape as the "Investor." Addendum at 1-2.

Both the Investment Agreement and the Addendum were ultimately incorporated by reference into the CSA, which reads: "[T]he [Addendum] executed between Seagrape and several of the Companies on September 19, 2014 . . . and in turn modifying the [Investment Agreement] executed between a number of the Parties on April 30, 2013 . . . are ratified and confirmed in their

9

entirety, except as superseded or modified by this Agreement . . . ." CSA, Fourth Acknowledgement, at 2. The same provision added OP Colombia as "jointly and severally liable for all of the obligations of the other Companies under such Addendum as though it were an original party to such an Addendum." *Id.* Seagrape is thus entitled to attorney's fees and costs from certain of the OP Defendants in connection to the debt owed under the CSA. *See Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995) ("Incorporation by reference produces a single agreement out of the incorporated documents and the contract itself."); *Ronan Assocs., Inc. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs, AFL-CIO*, 24 F.3d 447, 449 (2d Cir. 1994) ("Parties to a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements to which they are not party.").

## CONCLUSION

For the foregoing reasons, as well as those articulated in the Court's decision dated September 23, 2022, Seagrape's motion for summary judgment is granted. Although Seagrape's right to payment from Defendant OP BVI—but not the other Obra Pia debtors—remains subordinated pursuant to the Subordination Agreement, the Court is not precluded from entering judgment for Seagrape at this time. By separate order, the Court will refer this matter to Judge Netburn for an inquest into the amount of attorney's fees and costs owed. The Clerk of Court is directed to terminate the motion pending at ECF No. 165.

Dated:   July 26, 2023
         New York, New York

                                            _____
                                            Ronnie Abrams
                                            United States District Judge